[Crim. No. 545. Fifth Dist. Feb. 18, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ZARAGOZA GONZALES et al., Defendants and Appellants.

594

## COUNSEL

Jose Zaragoza Gonzales, in pro. per., Robert G. Carter and Leonard C. Hoar, Jr., under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COAKLEY, J.**—A jury found appellants guilty of murder, second degree. Nunez, a third defendant, was found guilty of the same offense, but his motion for a new trial was granted. The motions of the appellants for new trials were denied.

On October 1, 1967, the three defendants drove to Kearney Park, Fresno, where a Mexican festival was in progress. Defendant Trevino got out of the car, and defendants Gonzales and Nunez proceeded to a parking area. As Trevino got out of the car, Pitas Gonzales and his brother, Gabby, appeared and demanded a ride to Chinatown. Trevino refused, and, according to his testimony, Pitas and Gabby beat him up. Jose Gonzales and Nunez were walking toward the festival area, after parking the car, when they encountered Pitas and Gabby. The four men were talking when Trevino approached them and told Gonzales and Nunez that they should have nothing to do with Pitas and Gabby because they had just beat him up. Pitas Gonzales and the appellant, Jose Gonzales, were not related though they knew each other. Eyewitnesses testified to observing the defendants beckoning Pitas toward them, then standing momentarily in close proximity to him, then following close behind him as he continued walking. The raised voices of the men were heard in argument and cursing, accompanied by a waving of arms in a threatening manner. One of the defendants was observed to have his hand in his pocket. Suddenly Pitas was stabbed in the chest, once. As he walked away slowly, the three defendants followed him a short dis-

tance during which the two who had not stabbed Pitas pulled knives from their pockets, held them in their hands briefly, and then returned them to their pockets. As they followed the dying Pitas, one of the defendants was heard to say, "Let me finish him," to which a second defendant said, in essence, leave him alone, he's been stabbed already. Pitas walked to a nearby tree, slumped to the ground, and died within 15 minutes. Two to five minutes elapsed between the time the five men were first heard and observed in argument, and the time that Pitas walked away mortally wounded. When Pitas slumped to the ground, the defendants walked to their car, entered it, and drove away. They did not offer to aid Pitas. They drove out of the park but returned shortly. They were identified by bystanders and taken into custody by special officers, Banuelous and Cardova, who were on patrol duty in the park. Banuelous had seen Pitas slump to the ground, but he had not witnessed the events prior thereto.

After the defendants were taken into custody, Banuelous directed them to walk to where Pitas was lying on the ground. As they walked each rid himself of a knife. Trevino by dropping his to the ground, Jose Gonzales by throwing his under a car, and Nunez by tossing his knife to a bystander. The three knives, one a kitchen paring knife, another a pocket knife, and the third a grape knife, were quickly retrieved by the special officers. A laboratory test disclosed blood of the same type as Pitas' on the paring knife. Red cotton fibers were also found on the paring knife. Pitas was wearing a red shirt when stabbed. When taken into custody, the left side of Trevino's trousers was spotted with blood, which matched Pitas' blood type. Banuelous testified that it was Trevino who dropped the paring knife to the ground. Trevino denied ever seeing the paring knife and stated that Gonzales must have placed it between them on the car seat as they drove away, thus accounting for the blood on Trevino's trousers leg.

The prosecution's witnesses, Jose and Tomasa Torres, were about 35 feet from the men when their attention was attracted to them by their loud, angry voices. They testified that Jose Gonzales stabbed Pitas with the paring knife, and that it was Jose Gonzales who said, "Let me finish him," to which Nunez replied, "Leave him alone now, you have already stabbed him."

At the trial, Jose Gonzales and Nunez named Trevino as the killer, and Trevino named Jose Gonzales. None of the testimony pointed to Nunez as the actual killer. Testimony was offered by all three defendants, by their respective cellmates, and by others, which if believed by the jury and weighed with other independent evidence, was sufficient to sustain a finding against either Jose Gonzales or Trevino as the one who stabbed Pitas. Patently, some of the witnesses, including at least one or more of the defendants, lied.

Equally patent is the fact that one of the three defendants killed Pitas.

The ultimate question is not which of the three defendants did the stabbing, but whether the appellants participated in the crime either as the killer or as an aider and abettor of the killer. We now consider that question.

I. *Was the evidence sufficient to find both Gonzales and Trevino guilty of second degree murder either as the killer or as an aider and abettor? Yes.*

In support of his position that the evidence is insufficient to hold him under either theory, each appellant argues in essence that: (1) Admittedly, the evidence is sufficient to establish that one of the three defendants killed Pitas, but (2) it fails to establish, beyond a reasonable doubt, that either appellant was the actual killer; (3) being unable to determine which of the three defendants killed Pitas, the jury reached a compromise verdict and found all guilty of murder on the theory that one did the killing and the other two aided and abetted; (4) the evidence is insufficient to convict either appellant of aiding and abetting; (5) therefore, it not having been proved beyond a reasonable doubt that either appellant was guilty of the actual killing or of aiding and abetting, the judgments must be reversed.

A similar argument was advanced in *People* v. *Durham,* 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198], and rejected by the court in these words: "Thus would defendant . . . divide and conquer. The difficulty is that the prosecution's theory of the case cannot be split into such fragments." (P. 180.) Nor can the prosecution's theory in this case be split into the fragments urged by appellants.

The prosecution charged the three defendants with murder. It proved beyond a reasonable doubt that one of the three killed Pitas. That is all that it was required to do to lay the foundation for proof of aiding and abetting on the part of all defendants similarly charged with the murder.

Penal Code section 31 provides that: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed."

The rule is summarized in 1 Witkin, California Crimes (1963) section 45, pages 47-48: "To be liable as an abettor the defendant must have *instigated* or *advised* the commission of the offense or must have been present for the purpose of *assisting. (People* v. *Villa* (1957) 156 C.A.2d 128, 133. . . .)

"It is not necessary, however, to go so far as to prove participation in the

planning of the crime; although not a coconspirator, one may be a principal by reason of some affirmative action at the time of its commission. The test is 'whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures.' (*People* v. *Villa, supra,* 156 C.A.2d 134.)"

In *People* v. *Moore,* 120 Cal.App.2d 303 [260 P.2d 1011], the three defendants followed two men up a stair case. One defendant had a knife in his hand. One took $7 from the victim. During the robbery, the appellant, Moore, stood 4 or 5 feet from the other defendants. He neither did nor said anything during the robbery, and he fled with the other two defendants. The testimony was in conflict as to which of the defendants had possession of the knife and money when apprehended. The officers testified that both the money and the knife were in Moore's possession, while the victim testified that they were recovered from a different defendant. The court affirmed Moore's conviction, holding that he aided and abetted in the robbery, stating at page 306: "Appellant cites no authorities in support of his contention that because Moore said nothing and did nothing during the progress of the robbery he was not a participant and did not aid or abet the robbery. Appellant was not a mere bystander or onlooker. He may have committed no overt act during the robbery but none was required. His presence could have given encouragement to his companions and acted as a deterrent to any continued resistance on the part of Lopez. He was in the position of a lookout and though he gave no warning none was required. He was in the company of the other defendants before the crime was committed, remained with them during the robbery, fled with them from the hotel, and when arrested in company with the others had the knife and stolen bills in his possession. That is sufficient to make him a participant in the crime. 'The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting; and it has also been held that presence, companionship, *and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.'* " (Italics added.) (See *People* v. *Flores,* 269 Cal. App.2d 666, 669-670 [75 Cal.Rptr. 231].) ▮ The opinion in *People* v. *Moore, supra,* concludes with this statement of law, which is applicable in this case: " 'Where two or more persons enter upon a common undertaking, whether by prearrangement, or entered into on the spur of the moment, and that undertaking contemplates the commission of a criminal offense, each of the parties to the undertaking is equally guilty of the offense committed whether he did an overt act or not.' " (Pp. 306-307.)

In *People* v. *Durham, supra,* 70 Cal.2d 171, 181, the court quoted the following language in *People* v. *Villa, supra,* 156 Cal.App.2d 128. " '*One*

*may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it.* [Citations.] *Moreover, the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.* [Citations.]' (Italics added.) (156 Cal.App.2d at pp. 133-134; see also 1 Witkin, Cal. Crimes (1963) §§ 44, 45, pp. 46-49.)"

■ We are aware that standing *alone* none of the separate acts of conduct enumerated in our statement of facts, *supra,* is sufficient to convict the defendants of aiding and abetting a murder.[1] But each does not stand alone. All must be viewed in combination and in context. Thus viewed, the most reasonable interpretation of the evidence, and the one undoubtedly adopted by the jury, is that the three defendants joined in encouraging Pitas to come closer so that they could attack him. The fact that all three carried knives, which they pulled from their pockets instantly upon Pitas' being stabbed, and followed closely after the retreating Pitas, raises a strong inference that they were prepared to use their knives on Pitas, if necessary, for their own protection, or on any of Pitas' friends who might come to his rescue. While the appellants interpret the show of knives as acts of bravado, the jury was equally entitled to interpret it in the manner herein suggested. Clearly, each defendant is liable for the "natural and reasonable or probable consequences of any act that he knowingly aided or encouraged." (*People* v. *Villa, supra,* 156 Cal.App.2d 128, 134.)

*People* v. *Butts,* 236 Cal.App.2d 817 [46 Cal.Rptr. 362], on which appellants strongly rely, is readily distinguishable. Butts was found guilty of conspiring to commit assault, simple assault, and involuntary manslaughter, and acquitted of second degree murder. Therefore, the court's discussion of second degree murder as against Butts under the title "Appeal of Butts" (at p. 835) was dicta. However, because of the appellants' reliance upon that case, we point out the substantial factual differences. The fist fight in which Butts engaged with two boys took place "45 to 100 feet" from where his codefendant fought and cut up three other boys, one of whom died from the knife wounds. Butts was "too intoxicated to land a punch and was struck repeatedly by Tom Abreau," one of the several boys who challenged Butts and his codefendant to fight. Butts' blood alcohol reading was

---

[1](1 Witkin, Cal. Crimes (1963), § 45, pp. 47-48; *People* v. *Woodward,* 45 Cal. 293 [13 Am.Rep. 176]; *People* v. *Carlson,* 177 Cal.App.2d 201 [2 Cal.Rptr. 117]; *People* v. *Villa, supra,* 156 Cal.App.2d 128; *People* v. *Weber,* 84 Cal.App.2d 126 [190 P.2d 46]; *People* v. *Hill,* 77 Cal.App.2d 287 [175 P.2d 45].)

.206. There was no evidence that Butts possessed a knife, or was aware that his codefendant possessed one, and no evidence that he shared his codefendants' wrongful purpose in using the knife. In the language of the court: "He could have had no awareness of the course of events in the . . . affray," of his codefendant, Butts being "thoroughly absorbed in absorbing punches from his two opponents."

■ Parenthetically, in affirming the judgment of guilty of second degree murder as against Butts' codefendant, the court held that: "Conviction of second degree murder requires no proof of premeditation or even of actual intent to take life; rather, the malice (intent) necessary to constitute second degree murder may be implied from commission of an unlawful act without sufficient provocation 'or when the circumstances attending the killing show an abandoned and malignant heart.' [Citations.]" (P. 827.)

In our opinion, that is a correct statement of the law applicable in this case both to the actual killer and to his aider and abettor.

Under the substantial evidence rule, our task is limited to ascertaining whether there is substantial evidence to support the conclusions of the trier of fact, which necessarily were that Pitas was killed by one of the three defendants, and that the killer was aided and abetted by the other two.

■ "The test on appeal is whether there is substantial evidence to support the conclusions of the trier of fact. It is not whether guilt is established beyond a reasonable doubt." (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].) ■ "After conviction all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient evidence to support it." (*People* v. *Gutierrez,* 35 Cal.2d 721, 727 [221 P.2d 22].)

■ We hold that the conduct of each appellant, when viewed in context and in its totality, constitutes substantial evidence to support the jury's verdicts and the resultant judgments of murder in the second degree upon the theory that one òf the three defendants killed Pitas and the other two aided and abetted him. We hold further that, in the absence of other alleged error, which allegations we consider below, the judgments must be affirmed, even though the verdicts do not designate which of the three defendants was the actual killer and which were the aiders and abettors.[2] The fact that the trial court saw fit to grant a new trial to Nunez does not alter the result reached herein. The court's reasons for granting Nunez a new trial do not

---

[2]Of course, if there was no substantive evidence that one of the appellants aided and abetted the actual killer, then it would become necessary to reverse as to both appellants, and order a retrial or retrials. This, for the reason that the verdicts did not specify which of the defendants was the killer, and we may not speculate as to which of the three, in the judgment of the jury, did the stabbing.

appear in the record and we refrain from speculating thereon. (See *People v. Merriam,* 66 Cal.2d 390 [58 Cal.Rptr. 1, 426 P.2d 161].)

We turn now to a consideration of other alleged errors urged by the appellants.

■ II. *Did the court err in denying appellant Trevino's motion for a separate trial? No.*

We have examined the cases on which appellants predicate their assertion of error, and find none applicable on this issue.[3]

The crime was committeed October 1, 1967. An information was filed November 7, 1967, and the defendants were arraigned and pleaded not guilty on November 8, 1967. The trial was set to commence January 4, 1968, but was continued to January 22. On January 18, 1968, two court days before the trial was scheduled to commence, appellant Trevino moved for a severance of trials. The court heard argument, and on January 19, 1968, denied the motion. The legislative policy in favor of joint trials is expressed in Penal Code section 1098, wherein the Legislature has declared that two or more defendants jointly charged with a public offense *must* be tried jointly, unless the court, in its discretion, orders separate trials. (See *People* v. *Graham,* 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Lara,* 67 Cal.2d 365, 394 [62 Cal.Rptr. 586, 432 P.2d 202].)

Trevino's motion for severance, on its face, does not state compelling reasons for granting separate trials, and we do not have the benefit of the transcript of the oral argument in support of the motion. In retrospect it appears that separate trials might have obviated other alleged errors of which both appellants complain. ■ However, a motion for severance must be decided upon the "showing made at the time of the making of the motion and not upon what may have transpired thereafter at the trial." (*People* v. *Santo,* 43 Cal.2d 319, 332 [273 P.2d 249]; see *People* v. *Clark,*

---

[3] *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]; *People* v. *Charles,* 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545]; *People* v. *Gonzales,* 66 Cal.2d 482 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Hill,* 66 Cal.2d 536 [58 Cal. Rptr. 340, 426 P.2d 908]; and *People* v. *Graham,* 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153], do not involve motions for severence. The error in each was the admission in evidence of "unedited" extrajudicial confessions or statements of a defendant which implicated his codefendant in violation of defendant's rights as defined in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

In *People* v. *Massie,* 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869], defendant Vetter made a motion for a severance advancing four cogent reasons therefor, including extrajudicial confessions of his codefendant accusing Vetter of the crimes charged. No confession was offered in our case.

62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856], and *People* v. *Eudy*, 12 Cal.2d 41 [82 P.2d 359].) ■ An appellate court is limited to a consideration of matters contained in the record. (*People* v. *Merriam, supra,* 66 Cal.2d 390.) ■ Under these circumstances, we cannot find, and we do not infer, that the trial court abused its discretion in denying the motion.

■ Appellant Gonzales did not make a motion for severance, nevertheless, he argues that it was error to deny Trevino's motion, and that he may now take advantage of the alleged error. He also argues that, in view of the court's denial of Trevino's motion, it would have been futile for him to make a similar motion.

We disagree with Gonzales' contention. He failed to make a motion for severance, and failed to give the court the benefit of his reasoning as to why he would be prejudiced by a joint trial. Had he done so, it is possible the court may have found his reasons sufficient, standing alone or when weighed with the reasons assigned by Trevino. ■ A failure to request a severance constitutes a waiver which will not be reviewed on appeal. (*People* v. *Santo, supra,* 43 Cal.2d 319, 332; *People* v. *Irvin,* 264 Cal.App.2d 747, 764-765 [70 Cal.Rptr. 892].)

The alleged error in not granting separate trials, and our conclusion that the trial court did not err in denying the motion, is a separate and distinct question from that which we next consider.

■ III. *Did the admission in evidence of Gonzales' extrajudicial statement to the effect that Trevino stabbed Pitas constitute reversible error as to Trevino?* No.

The admission in evidence of Gonzales' statement came about in this way: Gonzales testified on direct examination that Trevino stabbed Pitas. On cross-examination by the district attorney, he stated that he had not theretofore told anyone that Trevino did the stabbing. He repeated the last statement on cross-examination by Trevino's attorney. Even after his own attorney, Mr. Carter, interjected, "How about his attorney?" he again said that he had never told anyone except Nunez that Trevino did the stabbing. On redirect he testified that prior to the preliminary hearing, he told Mr. Carter that Trevino stabbed Pitas. He reiterated it on re-cross-examination. Mr. Carter then took the stand and testified that in a jail conference, prior to the preliminary hearing, Gonzales told him that Trevino stabbed Pitas. On cross-examination of Mr. Carter, counsel for Trevino developed that the notes which Mr. Carter made during his jail conference contained no references to Gonzales' alleged statement that Trevino did the stabbing. The cross-examination of both Gonzales and Mr. Carter was extensive. Careful

reading of the reporter's transcript gives the impression that Mr. Carter's testimony was offered and received for the purposes of rehabilitation, i.e., rebutting the inference of recent fabrication by Gonzales left by counsel's cross-examination of Gonzales and of his attorney. There were no objections to Mr. Carter's testimony, no motion to strike, and no request for an admonition that the extrajudicial statement could not be treated as substantive evidence that Trevino stabbed Pitas. To the extent that it may have been treated as substantive evidence by the jury, it was merely repetitive and supportive of Gonzales' in-court testimony given on cross-examination by both the prosecutor and by Trevino's attorney. As held in *People* v. *Washington,* 71 Cal.2d 1061, 1078 [80 Cal.Rptr. 567, 458 P.2d 479]: "Since the hearsay statements were identical with the courtroom testimony, the jury could not have logically believed the former and disbelieved the latter. In short, the only value of the prior statements lay in the mere repetition of what had been said on direct examination. There was thus no ' "reasonable possibility" ' (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710]) that the constitutional error contributed to defendant's conviction."

It is abundantly clear that the testimony concerning the extrajudicial statement came as a complete surprise to the prosecution and to Trevino's attorney. Such unforeseen surprises and forays are not infrequent in joint trials,[4] including trials where there has been no motion for severance. If, under such circumstances a new trial must be granted, then, out of an abundance of caution, and without the benefit of the reasons for separate trials, courts will be prone to grant motions for severance or order severance on their own motion. In that event, Penal Code section 1098 will become more honored in its breach than in its observance, and the legislative policy therein proclaimed will be vitiated unnecessarily. We recognize that the benefits accruing to the taxpayer, to overloaded courts and understaffed prosecuting authorities, as well as to witnesses, are insufficient reasons for a joint trial where fundamental rights of a codefendant may be prejudiced. (*Bruton* v. *United States,* 391 U.S. 123, 134-135 [20 L.Ed.2d 476, 484-485, 88 S.Ct. 1620].) However, we hold that Mr. Carter's testimony, whether received with or without objection, did not constitute error, and if error, the error was not of constitutional dimensions requiring a reversal. (*People* v. *Washington, supra,* 71 Cal.2d 1061, 1078.) The cases relied on by Trevino, principally, *People* v. *Aranda, supra,* 63 Cal.2d 518, *Bruton*

---

[4]". . . instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." (*Bruton* v. *United States,* 391 U.S. 123, 135 [20 L.Ed.2d 476, 484, 88 S.Ct. 1620].)

v. *United States, supra,* 391 U.S. 123, and *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], are distinguishable and are not controlling.[5]

In *People* v. *Washington, supra,* 71 Cal.2d 1061, over defendant's objections, prior consistent statements were introduced by the prosecution for the purpose of rehabilitating a witness. The court held that in the absence of instructions expressly limiting the jury's use of the extrajudicial statements to rehabilitation, the admission of the statements constituted constitutional error. However, the court then held that the error was harmless: "We are satisfied, however, that the error was harmless to defendant 'beyond a reasonable doubt.' (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see *People* v. *Johnson, supra,* 68 Cal.2d at p. 660.) *The prior extrajudicial statements of the witnesses were in form and substance substantially identical with the in-court testimony of the witnesses at the trial.* The jury was obviously free to give

---

[5]In *Aranda* that which the court held to be prejudicial error was (1) a confession by one defendant implicating his codefendant, which was (2) introduced by the prosecution. In our case, there was no confession, the statement was exculpatory, Gonzales denying guilt and accusing Trevino, and it was not introduced by the prosecution, who apparently was as surprised as anyone by the statement.

*Bruton* does not support Trevino's position for much the same reason that *Aranda* does not support it. In *Bruton,* as in *Aranda,* the prosecution introduced an oral confession of Bruton's codefendant, which implicated both men. The codefendant did not take the stand, and, consequently, there was no opportunity for confrontation and cross-examination. Accordingly, the court held that there was a denial of Bruton's Sixth Amendment right of confrontation, and that such denial was not cured by the court's carefully drawn instruction that the confession should be considered only as against the codefendant who allegedly made it. In our case, as noted, there was no confession, there was no way of anticipating or forestalling the extrajudicial statement complained of, and there was a confrontation and extensive cross-examination. Further, while there was ample opportunity to object, no objection was offered.

In *Johnson,* on the testimony of mother and daughter, the appellant husband and father was indicted on charges of incest. He pleaded guilty and spent almost three years in prison. His plea was then set aside because of a constitutional error. He pleaded not guilty, was retried and convicted. At the trial mother and daughter recanted and testified that the defendant had not committed the alleged acts of incest. The district attorney then introduced the mother's and her daughter's grand jury testimony. In accordance with Evidence Code section 1235, the court instructed the jury to treat the testimony as substantive evidence. On appeal, the court held that admitting such prior testimony as substantive evidence, as distinguished from evidence for impeachment purposes only, constituted a violation of the defendant's Sixth Amendment right to confrontation, and that the error was of constitutional proportions, requiring reversal. It also declared that such error does not automatically deprive the accused of a fair trial, and that the conviction will be reversed only in those cases in which prejudice actually ensues.

See also *People* v. *Graham, supra,* 71 Cal.2d 303, to the same effect as *Johnson.*

the in-court testimony full substantive use if they believed it and defendant's conviction indicates that they did." (Pp. 1077-1078.) (Italics added.)

**IV.** *Did the court err in not giving accomplice instructions?* No.

Such instructions were not requested. Trevino now argues that two such instructions should have been given, *sua sponte.* They are: (1) That the testimony of an accomplice should be viewed with caution. The giving of such an instruction is required where the accomplice is called as a witness by the prosecution (*People* v. *Miller,* 185 Cal.App.2d 59, 82 [8 Cal.Rptr. 91], and *People* v. *Cuellar,* 262 Cal.App.2d 766 [68 Cal.Rptr. 846]). It should not be given where a defendant testifies in his own behalf (*People* v. *Hartung,* 101 Cal.App.2d 292, 295 [225 P.2d 614]). Here, each of the defendants testified in his own behalf. None was called by the prosecution. Further, as pointed out in *Hartung, supra,* the giving of such an instruction would have been prejudicial to all three defendants. If given, it would most certainly have been urged as error by the appellants. (2) The second instruction which Trevino argues should have been given is to the effect that a conviction cannot be had upon the uncorroborated testimony of an accomplice. (Pen. Code, § 1111.) Such instruction is required only where the accomplice is called as a witness by the prosecution. (*People* v. *Gurule,* 236 Cal.App.2d 847 [46 Cal.Rptr. 459].) Further, where each of several defendants testified in his own behalf, and none is called as a witness for or against the other, as here, accomplice's instructions are not appropriate. (*People* v. *Sawyer,* 256 Cal.App.2d 66, 73 [63 Cal.Rptr. 749].) This is equally true where a defendant denies participation and incriminates a codefendant. (*People* v. *Sawyer, supra.*)

**V.** *Did the court err in not instructing on diminished capacity, sua sponte?* No.

Trevino, alone, raises this issue. The testimony is vague as to the quantity of alcohol consumed. According to Trevino, he drank perhaps 12 beers and a small quantity of wine over a period which extended from mid-morning until they reached Kearney Park around 4:30 p.m. On cross-examination, he testified that he was not staggering, he thought he was drunk but knew what he was doing, he was all right, he did not pass out, he had not told anyone that he was so drunk that he could not remember what happened, and he remembered how the fight started. Gonzales, with whom Trevino spent most of the day, testified to drinking several beers and that he was "feeling good." On cross-examination, he repeated three times that he was not drunk.

Counsel for Trevino did not request an instruction on diminished capacity, and the subject was not argued. That no one identified with the case harbored any notion that the doctrine of diminished capacity was applicable is best attested to by the fact that before instructing the jury the court inquired whether, in the light of the testimony as to the beer consumed, any of the attorneys believed that a diminished capacity instruction should be given. All answered in the negative. Patently, none believed that any of the defendants was intoxicated.

We hold that no error was committed in failing to instruct, *sua sponte,* on the doctrine of diminished capacity. As noted, none of the attorneys considered that the evidence warranted such an instruction, and with commendable honesty they said so. For this court, on the basis of the cold record of Trevino's having consumed an indeterminate amount of beer, to now second-guess all the attorneys and the trial court, and rule that the evidence of Trevino's intoxication was such as to require a diminished capacity instruction, *sua sponte,* will open the floodgates to such demands in all other cases where there is testimony that the defendant had the proverbial "couple of beers." This we decline to do.

The cases relied on by Trevino are clearly distinguishable. Thus, in *People* v. *Rodriguez,* 274 Cal.App.2d 487 [79 Cal.Rptr. 187], a criminologist testified that the defendant had a blood alcohol content of .20, and that to reach that level a man his size would have to consume 20 to 25 ounces of 86 proof alcohol. In *People* v. *Stewart,* 267 Cal.App.2d 366 [73 Cal. Rptr. 484], the court noted that there was substantial, though conflicting, evidence that the defendant was "highly intoxicated." In *People* v. *Butts, supra,* 236 Cal.App.2d 817, which did not involve the issue of *sua sponte* instructions on diminished capacity, the defendant's blood alcohol content was .206, and he was "too intoxicated to land a punch and was struck repeatedly" by his opponent in the fight.

 VI. *Was it error to permit an interpreter to testify as to the remarks between defendants Trevino and Nunez overheard by her?* No.

Interesting as is the point academically, we refrain from passing on it for the reason that no objection was made below to Mrs. Perez' testimony. Accordingly, the objection is deemed waived. (*People* v. *De Santiago,* 71 Cal. 2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Robinson,* 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].)

VII. *Was counsel for Trevino guilty of misconduct prejudicially affecting Gonzales?* No.

Gonzales makes several assignments of such misconduct. We have considered each accusation separately, and in combination, and we conclude that such misconduct, if any, was not prejudicial.

The judgments are affirmed.

Stone, P. J., and Gargano, J., concurred.

Petitions for a rehearing were denied March 18, 1970, and appellants' petition for a hearing by the Supreme Court was denied April 15, 1970.