Marvin Leslie **TOOLATE,**
Petitioner-Appellant,

v.

Robert **BORG,** Respondent-Appellee.

No. 86–15074.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1987.

Decided Sept. 22, 1987.

Michael Satris, Bolinas, Cal., for petitioner-appellant.

David Salmon, San Francisco, Cal., for respondent-appellee.

Before CHOY, SNEED and TANG, Circuit Judges.

SNEED, Circuit Judge:

Marvin Toolate, convicted of murder in the first degree, petitions for habeas corpus on Confrontation Clause grounds. His codefendant Fraser testified at trial but refused to allow Toolate to cross-examine

him. The state trial court struck Fraser's testimony, instructing the jury to disregard it completely. The judge refused, however, to declare a mistrial.

The federal district court, on collateral review, ruled that Toolate's confrontation rights had not been violated and, alternatively, that the alleged error was harmless. Although we find that there was a constitutional violation, we agree that it was harmless and therefore affirm.

## I.

### FACTS AND PROCEEDINGS

Robert Daniel was found dead in his basement in November of 1978. He had wounds from a shotgun blast on various parts of his body and three bullet holes in his skull behind the ear. His house had been burglarized.

Toolate and Fraser were tried jointly for the crimes. Three months into the trial, the government having rested (its evidence will be discussed in detail below), Fraser took the stand in his own defense. He admitted having fired at Daniel once with a shotgun, but intimated that he did so in self-defense. It was Toolate, according to Fraser, who fired the series of bullets found in Daniel's skull.

At the court's request, the prosecutor began Fraser's cross-examination. After a day and a half of questioning, Fraser grew truculent and refused to answer further. Four times the trial court held Fraser in contempt, but to no effect. Toolate was never able to cross-examine him.

The judge denied Toolate's motion for a mistrial. Instead he struck Fraser's testimony and instructed the jury at length to disregard it. Toolate (as well as Fraser) was convicted of first-degree murder and various theft offenses. He was sentenced to life in prison without possibility of parole. The state appellate courts denied relief.

## II.

### ISSUES

Petitioning for habeas corpus, Toolate has one allegation of reversible error: that instructing the jury to disregard Fraser's testimony was inadequate under the Confrontation Clause. In a series of cases beginning with *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court has held that an instruction to disregard a codefendant's out-of-court confession is constitutionally insufficient where the codefendant does not testify and therefore cannot be cross-examined. The unusual facts before us present the question, which we believe to be of first impression, whether *Bruton* applies to a codefendant's in-court confession where the codefendant has testified but refuses to be cross-examined.

Although the issue is not free from doubt, we conclude that there was *Bruton* error at Toolate's trial. After discussing our reasons for so holding below, we go on to decide whether that error was prejudicial.

## III.

### DISCUSSION

#### A. *Was the instruction sufficient?*

■ Toolate without doubt had a constitutional right to cross-examine Fraser. *See Brown v. United States,* 56 F.2d 997, 999–1000 (9th Cir.1932) (codefendant who testifies in his own behalf and incriminates the defendant becomes a witness "against" him for Confrontation Clause purposes). Prosecutorial cross-examination of a codefendant does not satisfy the defendant's confrontation rights. *See United States v. Zambrano,* 421 F.2d 761, 762–63 (3d Cir. 1970); *Parker v. United States,* 404 F.2d 1193, 1196–97 (9th Cir.1968), *cert. denied,* 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969).

■ Ordinarily, when a testifying witness cannot or will not be cross-examined, "the appropriate relief ... is to strike the direct testimony of the witness" and to instruct the jury to disregard it. *United States v. Lyons,* 703 F.2d 815, 819 (5th Cir.1983); *see United States v. Malsom,* 779 F.2d 1228, 1239 (7th Cir.1985) (witness

died before cross-examination) ("We can perceive no Sixth Amendment violation where the district court struck [the witness's] testimony and took pains to instruct the jury to disregard it."); *United States v. Seifert*, 648 F.2d 557, 561 (9th Cir.1980).[1] In a very few cases, however, courts have not been content merely to strike.

If the direct testimony is especially prejudicial ..., we have held this remedy inadequate. On the premise that the jury could not follow the instruction to disregard the witness' testimony, we have then required a mistrial.

*Lyons*, 703 F.2d at 819; *see United States v. Malinsky*, 153 F.Supp. 321, 323–24 (S.D. N.Y.1957). As we noted earlier, Toolate relies on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to argue that a mistrial was required here.

In *Bruton*, the Supreme Court created an exception to the general presumption that juries will follow an instruction to disregard evidence.

[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135–36, 88 S.Ct. at 1627–28 (citations omitted). Therefore, the Court held, a new trial must be granted if such a confession is heard by the jury and the defendant does not have an opportunity to cross-examine.[2] *Id.* at 137, 88 S.Ct. at 1628.

The Supreme Court has recently emphasized that if a codefendant's uncross-examined confession goes to the jury and directly incriminates the defendant, courts are not to evaluate its prejudicial effect on a case-by-case basis, but to hold under *Bruton* that an instruction to disregard is invariably deficient. *Cruz v. New York*, —— U.S. ——, ——, 107 S.Ct. 1714, 1718–19, 95 L.Ed.2d 162 (1987). It is undisputed that Fraser's uncross-examined testimony directly incriminated Toolate. There remain a number of grounds on which *Bruton* might be distinguished, but we find none of them ultimately persuasive.

First, the government argues that Fraser's testimony was not a "confession," but an attempt to shift the blame to Toolate. This is nonsense. Most codefendant confessions are blame-shifting. Fraser admitted having shot Daniel. Had Fraser made the identical statements to the police, they would clearly have been *Bruton* material at trial.

Second, *Bruton* involved a non-testifying defendant's out-of-court confession. We know of no case applying *Bruton* to a codefendant's in-court confession. But that is because a testifying codefendant will ordinarily be fully cross-examined. Hence this difference offers little distinction when, as here, the testifying codefendant cannot be cross-examined. In-court confessions are no less credible or powerful as a rule than out-of-court ones. The contrary is probably true. At a subsequent trial of Toolate (if there were one), introducing a transcript of Fraser's testimony would clearly violate *Bruton* unless cross-examination were possible. To treat differently the original testimony, equally unavailable for Toolate's cross-examination, would be illogical. That the jury observed

---

**1.** An exception is made in cases where the witness refuses to be cross-examined only on matters collateral to his direct testimony. *See Seifert*, 648 F.2d at 561. In such cases the trial judge has discretion to refuse to strike the direct testimony. *Id.* Here, however, Fraser refused to allow Toolate to cross-examine him at all.

**2.** The conclusion that cross-examination is a sufficient remedy in *Bruton* cases is not entirely logical given the *Bruton* premises. Defendants have a due process right to be convicted only

upon admissible evidence, not simply a Sixth Amendment right to confront witnesses. If a jury cannot disregard a codefendant's confessions inadmissible against the defendant, there should be constitutional error even if the codefendant *is* cross-examined or even if he takes the stand and *denies* having confessed. But the law, as we know, is contrary. *See Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

Fraser's demeanor and heard the prosecutor's cross-examination is significant, but it did not satisfy Toolate's confrontation rights. *See Zambrano*, 421 F.2d at 762–63; *Parker*, 404 F.2d at 1196–97.

Third, as the district court pointed out, in *Bruton* the jury was called upon to consider the confession against the codefendant but to ignore it as to the defendant. This point has more relevance: perhaps juries *can* be expected to follow their instruction when asked to disregard the confession completely. However, the one court apparently to have addressed this issue did not agree. *See Simmons v. United States*, 440 F.2d 890, 891–92 (7th Cir.1971) (*Bruton* rule applied even though codefendant had pleaded guilty and was no longer before jury by the time the trial ended). We think *Simmons* was correct. The *Bruton* exception turned on the likely "devastating" effect of a codefendant's confession, not on the inconsistent treatment that the jury was supposed to accord it. *See Bruton*, 391 U.S. at 135–36, 88 S.Ct. at 1627–28.[3]

Finally, the government attempts to evade the *Bruton* rule in the name of the survival of joint trials. If *Bruton* is applied here, the argument goes, joint trials will become impossible: one defendant could always procure a mistrial for the other by testifying in his own behalf and then refusing to be cross-examined. This argument raises a more pressing concern. Its persuasiveness, however, is largely superficial.

Codefendants already have the opportunity to sabotage each other's trial through unethical tactics. For example, if one codefendant comments prejudicially on another's refusal to testify, the latter's conviction must ordinarily be reversed. *See*

*United States v. Patterson*, 819 F.2d 1495, 1506 (9th Cir.1987). The result is the same if one codefendant calls the other as a witness, requiring him to invoke his Fifth Amendment privilege in the jury's presence. *E.g., United States v. Kaplan*, 576 F.2d 598, 600 (5th Cir.1978), *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979). One codefendant could also produce a mistrial for another by testifying to irrelevant, highly prejudicial matter, such as the latter's prior criminal record. These dangers are inherent in the joint trial process.

Moreover, in the case of an unlawful refusal to be cross-examined, there are strong sanctions available to deter such conduct. To be sure, these sanctions (as in the instant case) will not always suffice. Nonetheless, a court must have some *evidence* of collusion on the part of the nontestifying defendant; the mere *possibility* of such collusion does not justify the deprivation of a clearly established constitutional right. In any event, it is quite unlikely that one defendant would be willing to confess in court to his participation in a crime simply in the hope of procuring a mistrial for the other. There is no evidence of any such plan here.

True, the government did not perpetrate the prejudice in this case, as it did in *Bruton*, and could not have prevented it. This is significant because the *Bruton* rule emerged in part to stop the government from using joint trials to circumvent the evidentiary rules that would apply in separate ones. That concern does not exist here. But *Bruton* rests, for good or ill, on the presumed inability of juries to disregard an incriminatory codefendant's con-

---

**3.** We are aware that *Bruton* has been described as a case in which the jury was "asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants." *Frazier v. Cupp*, 394 U.S. 731, 735, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969). But the "mental gymnastic" of considering evidence for one purpose and ignoring it for another is the characteristic feature of limiting instructions in general. It does not provide a ground for the *Bruton* exception. What does so, instead, is the special difficulty involved in dis-

regarding a codefendant's *confession*, together with its powerfully incriminating effect. *See Bruton*, 391 U.S. at 135–36, 88 S.Ct. at 1627–28. Note that the *Bruton* Court relied substantially on *Jackson v. Denno*, 378 U.S. 368, 388–89, 84 S.Ct. 1774, 1786–87, 12 L.Ed.2d 908 (1964), which held that a jury could not be expected to ignore the defendant's *own* confession even if instructed to disregard it *completely. See* 391 U.S. at 128–29, 88 S.Ct. at 1623–24. The *Denno* situation does not involve the "mental gymnastic" described above.

fession. In that crucial respect, this case is identical to *Bruton*.

We conclude that *Bruton* applies in the case at hand and that there was a *Bruton* error below.

### B. *Was the error harmless?*

■ A Confrontation Clause violation does not require reversal if the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). We hold in this case that it was.

The government's chief witness was Marilyn Ingram, Fraser's girlfriend at the time of the murder. She testified to the following.

On November 14, 1978, the day Daniel was killed, Fraser, Toolate, and Ingram were driven from San Francisco to Daniel's house in Santa Rosa. Ingram had been living with Daniel until the previous month and wanted to retrieve her clothing. Fraser had been involved in an extremely violent dispute with Daniel concerning Daniel's alleged theft of certain amphetamines. Toolate did not know Daniel.

Fraser was carrying a shotgun, Toolate a handgun with one bullet. As they arrived at Daniel's house, Fraser put on a pair of black gloves. Daniel allowed the three in. He and Toolate went to the basement where Ingram's clothes were. Ingram then heard Daniel say, "No, don't. For God's sake, don't. I didn't rip Fraser off. Please. For God's sake, don't." A shot went off. Fraser ran to the basement, carrying his shotgun. Ingram heard a loud blast followed by several more gunshots. Fraser and Toolate returned from the basement. Fraser said, "the man's dead."

The three searched the house for valuables. They left in Daniel's van, taking clothes and a television. Toolate said, "I thought this guy was rich." Fraser said, "Don't worry about it, we got some clothes." Toolate again mentioned money, and Fraser replied, "We'll take care of that once we get back to San Francisco." Toolate then described how he had killed Daniel. He said he had coldcocked Daniel, taken Daniel's handgun, and "emptied" it into his head. Toolate laughed and said to Fraser, "Don't it make you sick to see him fucking beg like that?"

A friend of Fraser's helped the three of them unload the van when they arrived at Fraser's home in San Francisco.

Other testimony confirmed Ingram's story. One witness admitted having driven Fraser, Ingram, and a man fitting Toolate's description to a Santa Rosa house on the day in question. Another said he had helped unload clothes and a television into Fraser's room that night. Police found articles of Daniel's clothing in Fraser's closet.

There was also damning confirmation of Toolate's role in the murder. A friend of Toolate's stated that the latter had asked her to sell a certain gun, which was later identified as Daniel's gun and which matched the bullets found in Daniel's skull. In addition, a cellmate of Toolate's testified that Toolate had told him in April, 1979, that he had gone to Daniel's house to "make a hit if the man wouldn't pay" and that he (Toolate) had "shot the sucker" behind the ear while Daniel pleaded for his life.

Defendant attempted to impeach Ingram and the cellmate. An expert testified that a person with Ingram's conceded amphetamine habit could suffer from hallucinations. The cellmate admitted that he disliked Toolate because of an alleged homosexual incident. Toolate did not testify.

Fraser then took the stand and testified as follows. He denied that he had intended any violent confrontation with Daniel. When he heard the shot from the basement, he feared Toolate had been hurt and ran to help him. He saw Daniel spin around, believed he saw something in Daniel's hand, and fired his shotgun. He immediately fled the basement and, from upstairs, heard a quick succession of four shots. Ten seconds later, Toolate came up from below.

Defendant makes two arguments why Fraser's testimony, assuming the jury was unable to disregard it, was harmful. First, conceding that Fraser's testimony was al-

most entirely cumulative, he says that the jury may have relied on Fraser's testimony to corroborate Ingram's. But Fraser repeatedly attacked Ingram's trustworthiness when he took the stand and indeed contradicted her at a critical point: he said that he had run out of the basement before the series of fatal bullets had been fired, whereas Ingram stated that both men were in the basement at that time and that both had emerged together. In addition, Fraser's testimony was patently self-serving. We think it clear that the jury believed Ingram *despite* Fraser's stricken testimony, not *because* of it.

Second, defendant argues that only Fraser gave direct evidence indicating that he (Toolate) and not Fraser had shot the series of bullets into Daniel's head. But both Ingram and the cellmate testified that Toolate had boasted of this himself. And in any event, under California law, Toolate's presence and assistance in Daniel's basement were sufficient to support his conviction regardless of whether he or Fraser actually fired the shots. *See Gurrieri v. Gunn,* 404 F.Supp. 21, 24 (C.D.Cal.1975); *People v. Gonzalez,* 4 Cal.App.3d 593, 599, 84 Cal.Rptr. 863, 866 (1970) (murder convictions of three codefendants sustained where state proved that one had killed victim and that the others aided and abetted, although the proof did not identify which was the actual killer); *see also United States v. Kegler,* 724 F.2d 190, 201 (D.C. Cir.1984) (defendant may be indicted as principal but convicted by proof showing him an aider and abettor). Thus the one alleged non-cumulative point in Fraser's testimony was legally irrelevant.

The evidence of Toolate's participation in the murder and robbery was overwhelming. Toolate's confrontation rights were violated when Fraser refused to be cross-examined, but the violation was harmless.

AFFIRMED.