21 F.3d 1118
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alfonso SIQUEIROS, Defendant-Appellant.
 No. 93-50381.
 United States Court of Appeals, Ninth Circuit.
 Submitted April 4, 1994.*
Decided April 13, 1994.
 
 Before: BROWNING, PREGERSON and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 OVERVIEW
 
 2
 Alfonso Siqueiros appeals the District Court's imposition of a sentence of twelve months and one day imprisonment, based on its finding that Siqueiros violated the terms of his supervised release. We have jurisdiction under 28 U.S.C. Sec. 2191. We affirm.
 
 BACKGROUND
 
 3
 Alfonso Siqueiros pled guilty to transportation of illegal aliens, and aiding and abetting the commission of this offense, in violation of 8 U.S.C. Sec. 1324(a)(1)(B), and 18 U.S.C. Sec. 2 on December 10, 1990. The District Court sentenced Siqueiros to twenty-seven months imprisonment, to be followed by three years of supervised release. As a condition of the supervised release, the District Court ordered Siqueiros to participate in a drug and alcohol program, which included urinalysis testing and counseling as directed by his probation officer.
 
 
 4
 Siqueiros's Probation Officer, Edgar T. Haskell, filed a petition on March 8, 1993, alleging that Siqueiros had violated the conditions of supervision on three separate grounds. First, Siqueiros had provided urine specimens which tested positive for cocaine on 7/23/92, 10/26/92, and 11/10/92. Second, Siqueiros failed to report as instructed for participation in the drug aftercare program on 8/13/92, 8/22/92, 8/28/92, 8/31/92, 10/8/92, 10/15/92, and 10/31/92. Finally, Siqueiros failed to report to his Probation Officer as instructed on 11/18/92, 12/2/92, and 12/16/92. (ER at 7.)
 
 
 5
 The District Court held an evidentiary hearing on April 19, 1993, during which Siqueiros requested the release of the documents containing the test results of his three urinalysis tests. The District Court gave the necessary order permitting the release of the test results, and scheduled an evidentiary hearing for May 3, 1993, to determine whether Siqueiros had violated the conditions of his probation as alleged.
 
 
 6
 At this hearing, Siqueiros admitted that he failed to report to the drug aftercare program on seven occasions, and that he failed to report to his probation officer on three occasions. Before admitting these allegations, the District Court specifically asked him: "Do you understand that if you do admit those allegations, that that would be grounds for me to revoke your supervised release? Do you understand that?" (ER at 23.) Siqueiros replied, "Yes, I do." Id.
 
 
 7
 Siqueiros then requested the District Court to disregard the cocaine allegation because the urine samples had been destroyed. The District Court denied this request, and proceeded to hear evidence on this issue.
 
 
 8
 The Government offered the testimony of Probation Officer Haskell, a "drug specialist" with the probation office with fifteen years' experience, as well as the three separate urinalysis reports from PharmChem (the testing laboratory), and chain of custody forms for the three specimens to support the drug use allegation. According to Haskell, PharmChem destroyed Siqueiros's specimens during a "housecleaning" process. Although Haskell could not testify to personal knowledge of PharmChem's processing and storage procedures, he testified in great detail[1] about the testing procedures and chain of custody practices used in drug testing by the probation office. In addition, Haskell explained the significance of each entry on the urine test reports and described in detail the tests that were performed on the urine specimens. Further, Haskell testified that he personally collected the third positive urine sample provided by Siqueiros at the Inglewood Probation Office, and completed the chain of custody form for the sample.
 
 
 9
 Finally, Haskell testified that probation officers receive notice that the specimens have tested positive for cocaine within approximately twenty-four hours of the report date shown on the laboratory results. In each of the three instances at issue, Haskell notified Siqueiros in writing of the positive test results. When later confronted by Haskell about the test results, Siqueiros denied using cocaine.
 
 
 10
 Defense counsel cross-examined Haskell without limitation. The District Court also questioned Haskell extensively as to the accuracy of the tests. Although the Government offered to call additional witnesses to establish the chain of custody, the District Court proceeded based on the evidence presented.
 
 
 11
 In making its ruling, the District Court reiterated that the standard of proof required in a revocation proceeding is a preponderance of the evidence, not proof beyond a reasonable doubt. In addition, the District Court noted that hearsay is admissible. Finally, the District Court found persuasive that not just one or two specimens tested positive, but that three specimen samples were reported positive.
 
 
 12
 [W]ith three positives, I just find that that really does fulfill the Government's burden of a preponderance of the evidence. Again, as I said, it's not beyond a reasonable doubt. So I do find that the Government has proven by a preponderance of the evidence that the supervised release conditions have been violated.
 
 
 13
 (ER at 55.)
 
 
 14
 The District Court then revoked Siqueiros's supervised release, and sentenced him to twelve months and one day imprisonment. This sentence was within the policy statement range for Siqueiros's violations and criminal history pursuant to Sentencing Guideline Sec. 7B1.4.
 
 ANALYSIS
 
 15
 On appeal Siqueiros contends that his due process and confrontation rights were violated at his supervised release revocation hearing because he was not afforded a meaningful opportunity to challenge the laboratory reports. Alleged violations of the confrontation clause are reviewed de novo. United States v. George, 960 F.2d 97, 99 (9th Cir.1992). Moreover, confrontation clause violations are subject to harmless error analysis. United States v. Vergas, 933 F.2d 701, 704-05 (9th Cir.1991). "A Confrontation Clause violation does not require reversal if the error was harmless beyond a reasonable doubt." Toolate v. Borg, 828 F.2d 571, 575 (9th Cir.1987).
 
 
 16
 In Morrissey v. Brewer, 408 U.S. 471 (1972), the Supreme Court held that the due process standard must be satisfied for parole revocation hearings. Due process requires that a parolee receive a fair and meaningful opportunity to refute or impeach the evidence against him "to assure that the finding of a parole violation will be based on verified facts." Id. at 484. The Court further established minimum guidelines to be used to assess whether this requirement was satisfied.[2]
 
 
 17
 1. written notice of the alleged violation(s);
 
 
 18
 2. disclosure to the parolee of the evidence against him;
 
 
 19
 3. an opportunity to be heard and present evidence;
 
 
 20
 4. the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);
 
 
 21
 5. a neutral and detached hearing body;
 
 
 22
 6. a written statement as to the evidence relied upon and the reason for revoking parole.
 
 
 23
 Id. at 489.
 
 
 24
 The Court also noted, however, that "the full panoply of rights due a defendant in [a criminal prosecution] does not apply to parole revocations. Id. at 480. Further, the Court went on to state:
 
 
 25
 We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.
 
 
 26
 Id. at 489.
 
 
 27
 Finally, where Morrissey rights to confrontation are at issue, the Ninth Circuit employs "a process of balancing the [parolee's] right to confrontation against the Government's good cause for denying it." United States v. Simmons, 812 F.2d 561, 564 (9th Cir.1987).
 
 
 28
 In United States v. Martin, this court applied these guidelines to determine the defendant's right to confrontation. 984 F.2d 308 (9th Cir.1993). In Martin, the defendant was accused of four separate violations of the conditions of his parole, including submission of two specimens that tested positive for cocaine. Martin conceded that the three admitted violations supported revocation of his supervised release, which would have resulted in a sentence of four to ten months under the Sentencing Guidelines. The District Court determined that a finding of guilt on the contested violation, however, would qualify as possession of a controlled substance under 18 U.S.C. Sec. 3583(g), which would automatically trigger an enhanced sentence of sixteen months.
 
 
 29
 The only evidence supporting the alleged drug violations was two positive laboratory urinalysis reports offered through the testimony of a counselor who collected Martin's specimens. Although the counselor could verify the test results, his testimony was otherwise limited only to the collection and shipping procedures. The District Court denied Martin's request to retest the specimens without explanation.
 
 
 30
 In a balancing approach, this court used three factors to determine whether the District Court's denial of Martin's request was improper: "the importance of the evidence to the court's ultimate finding, the virtually complete denial of any opportunity to refute the evidence, and the consequences of the court's finding." Id. at 311.
 
 
 31
 As to the first factor, this court found that the evidence was critical to the District Court's ultimate determination because the lab results were the only evidence offered to support a finding of Martin's guilt. Id. Regarding the second factor, the panel found that "Martin had virtually no opportunity to refute the test results," which amounted to a "nearly complete denial of any confrontation." Id. (emphasis in original.) Although Martin cross-examined the counselor who collected the samples, the counselor had only three and one-half months experience in his job and was unable to testify about the chain of custody or testing procedures beyond his own collection. Moreover, the panel emphasized that it was the District Court's denial of Martin's request to retest the samples which severely prejudiced Martin's right to confrontation.
 
 
 32
 Finally, the panel looked at the consequences of the District Court's findings. The District Court determined, based on the two positive test reports, that Martin was guilty of both use and possession of a controlled substance, which resulted in a sentence sixty percent beyond that which would have been imposed based on Martin's three admitted parole violations.
 
 
 33
 The panel then balanced Martin's interests against the Government's asserted good cause, based on the "difficulty and expense of procuring witnesses" and the "traditional indicia of reliability" of the evidence. Id. at 312 (citations omitted.) Regarding the first consideration, the panel gave "little weight" to the Government's argument, noting that at the minimum it could have provided affidavits, depositions, and documentary evidence from the testing facility.
 
 
 34
 The panel went on to state that the reliability factor "present[ed] a more difficult issue" because three other circuits[3] have previously upheld the admission of urinalysis tests in revocation hearings as reliable. Id. at 313. The panel, however, rejected creating a blanket rule of admissibility because neither the Government nor the case law demonstrated that "custody problems and testing errors happen with such rarity at testing laboratories that their reports are always inherently reliable." Id. Ultimately, the panel reversed Martin's conviction because of the all-but-complete denial of confrontation.
 
 
 35
 Although there are many similarities between Martin and the present case, there are several significant differences which lead us to a different result.
 
 
 36
 Under the first factor, the importance of the evidence to the District Court's ultimate finding, unlike in Martin, the reported lab results were not the only evidence offered against Siqueiros. Although Siqueiros was not given the opportunity to retest the specimens as he requested, both the actual lab test reports and the testimony of an experienced officer were presented at the hearing.
 
 
 37
 Application of the second factor, the virtually complete denial of any opportunity to refute the evidence, is also not quite as clear cut in the present case as it was in Martin. First, Probation Officer Haskell, through whom the test results were offered, had far more experience and knowledge in the area of drug testing and drug use than did the counselor in Martin. Haskell, with fifteen years' experience, is qualified as a "drug specialist" with the Probation Office. In addition, Haskell testified in detail about the collection and custody procedures. The counselor in Martin had been employed in his job for only three and one-half months, and the scope of his testimony appears to have been much more limited. Further, the three positive reports and chain of custody forms were offered into evidence, thus providing some documentary support for Haskell's testimony.
 
 
 38
 Moreover, neither the District Court nor the Government affirmatively acted to deny Siqueiros the opportunity to retest the specimens as did the District Court in Martin. When Siqueiros requested the opportunity to retest the specimens, the District Court granted the request and set the revocation hearing for a later date. Ultimately, the denial of opportunity resulted from PharmChem's error, not the District Court's lack of consideration for Siqueiros's rights. And, the Government offered to provide additional evidence from PharmChem if the District Court felt it was necessary.
 
 
 39
 Finally, under the third factor, the consequences which Siqueiros faces based on the District Court's finding of the drug allegation are different from the impact which resulted in Martin. Here, the District Court did not find that Siqueiros possessed a controlled substance as a result of the three positive test results. Under the applicable Sentencing Guideline 7B1.4, the violations which Siqueiros admitted resulted in a sentencing range of 8 to 14 months. Thus, the twelve months and one day sentence could have been imposed even without the finding of the drug violation.
 
 
 40
 These factors must next be weighed against the Government's assertion of good cause for denying Siqueiros the opportunity to refute the evidence against him. First, neither the Government nor the District Court directly caused the absence of the opportunity for Siqueiros to retest the samples. Probation Officer Haskell testified that the urine samples were lost or destroyed in a "housecleaning" by PharmChem.[4] Thus, the evidence's lack of availability was not due to an intentional act or negligence on the part of the Government.[5]
 
 
 41
 Further, Haskell's testimony appears more reliable than that of the counselor in Martin. Whereas in Martin no documentary evidence was provided by the Government, in the present case the Government provided documentary evidence consisting of the urinalysis reports and chain of custody forms as well as the testimony of an experience probation officer.
 
 
 42
 Moreover, Siqueiros could have subpoenaed other witnesses (presumably PharmChem personnel) if he had wanted to actively refute the evidence because he was aware of the test results before the revocation hearing. Siqueiros's failure to refute the evidence in other ways or question Haskell on cross-examination about the accuracy of the urinalysis should not be construed as showing a denial of confrontation based on the unreliability of the evidence presented.
 
 
 43
 Finally, under the harmless error analysis, we find that the loss of the specimens worked little to no prejudice against Siqueiros because the sentence he received was proper under the Sentencing Guidelines with or without the drug violation finding. In light of the standard of preponderance of the evidence which is applicable in revocation hearings, the District Court did not err in finding the testamentary and documentary evidence of three positive urinalysis test persuasive.
 
 
 44
 WE AFFIRM.
 
 
 
 *
 The panel unanimously found this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Officer Haskell testified as follows:
 At the time that a urine specimen is collected, there is a specific protocol which is followed by the person collecting the specimen. The protocol is based on the need for security of the specimen sample to assure that it arrives at the laboratory without having been tampered with or polluted in any way.
 The chain of custody form ... includes a specimen number, a place for the type of testing to be done, the name of the individual being tested, the date the specimen is collected--in this case, the I.D. number, and information collected by the test collector....
 In its original form, this document has two strips of adhesive paper, which can be used to seal it over the cap, and two bar code strips, which can be used on the side of the bottle.
 The protocol requires that once the individual has provided the specimen in the bottle and maintains eye contact with the bottle, he and the test taker go into an office, away from the restroom. The bottle is capped securely after perhaps the specific gravity has been checked and/or the temperature. At that point, the person providing the specimen then signs the document, and one of the adhesive strips, which has a place for the initials of the test taker and the person providing the specimen, is put over the top of the cap. Additionally, one of the copies off the bar code is then put on the side of the bottle.
 PharChem Laboratories, as part of their protocol, will not test a specimen unless the seal over the cap is in place and intact, and that the bar code is attached. That bar code reflects the same number as the number that's typed at the top of the chain of custody form, which is the specimen number. The top page is retained by the I.C.I. Projects, or in the case of the specimen collected by the probation officer, by the probation officer.
 Subsequent copies of the PharChem chain of custody form do not have the name of the person on it. It's a binding form, so that these forms go with the specimen to the laboratory without an identification of the individual who provided the specimen. Reporting back to the probation office or back to I.C.I. Projects is done on the basis of specimen number, which is reflected at the top of their laboratory report.
 (ER at 32-34.)
 
 
 [2]
 Federal Rule of Criminal Procedure 32.1, which applies to parole revocation hearings, articulates these same standards as well
 
 
 [3]
 See United States v. Kindred, 918 F.2d 485, 487 (5th Cir.1990); United States v. Burton, 866 F.2d 1057, 1059 (8th Cir.), cert. denied, 490 U.S. 1110 (1989); United States v. Bell, 785 F.2d 640, 643 (8th Cir.1986); United States v. Penn, 721 F.2d 762, 765-66 (11th Cir.1983)
 
 
 [4]
 It appears from Haskell's testimony at the revocation hearing that PharmChem is supposed to notify the Government as to the status of all test specimens
 PharmChem went through--for lack of a better term--a housecleaning process some number of months ago and older specimens which had been retained for court purposes were either confirmed as no longer being needed, and destroyed, or they were retained at the direction of the probation officer. For whatever reason, we never received notification of this process and our specimens were lost.
 (Er at 39.)
 
 
 [5]
 Regarding the issue of the impact that failure to preserve evidence has on the defendant's rights, the factors to be considered are the quality of the Government's conduct (i.e., the presence or absence of any showing that the Government contributed to or condoned the destruction of records), and the degree of prejudice worked against the defendant. United States v. Weinstein, 834 F.2d 1454, 1462-63 (9th Cir.1987)