UNITED STATES of America, Plaintiff–Appellee,

v.

**Walter SEIFERT and Jack Ehrlich, Defendants–Appellants.**

Nos. 79–1405, 79–1458.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1980.

Decided Dec. 19, 1980.

Richard H. Kirschner, Kirschner & Greenberg, Philip Deitch, Los Angeles, Cal., for defendants–appellants.

John G. Hawkins, Asst. U. S. Atty., Tucson, Ariz., for plaintiff–appellee.

Before DUNIWAY, ANDERSON and TANG, Circuit Judges.

DUNIWAY, Circuit Judge:

Walter Seifert and Jack Ehrlich appeal from judgments of conviction on 19 counts of interstate transportation of property taken by fraud in violation of the first paragraph of 18 U.S.C. § 2314 and one count of conspiracy to commit the same acts in violation of 18 U.S.C. § 371. We reverse the conviction of Seifert and affirm the conviction of Ehrlich.

### I. *The Facts.*

Appellants do not argue that their convictions are not supported by the evidence. We therefore state the facts only briefly; additional facts will be stated as necessary.

The indictment charges that in the fall of 1977 Ehrlich, Seifert, and one Joseph Peres, as part of a scheme to defraud their suppliers, established a retail store in Phoenix, Arizona, known as Videoflex. Videoflex was to specialize in the sale of photographic and electronic merchandise. The defendants planned to operate the store in a legitimate manner for a few months for the sole purpose of establishing a credit rating sufficient to induce suppliers to sell large amounts of merchandise to Videoflex on credit. On the pretense of opening a second store, the defendants ordered large quantities of goods on credit. When the defendants received these goods, they shipped them out of state in rental trucks. The goods were sold elsewhere and the creditors of Videoflex were left holding the bag.

Peres, as part of a plea bargain, pled guilty to one count of the indictment and testified against Seifert and Ehrlich.

### II. *Murray Saka's Testimony.*

Much of the present appeal concerns the testimony of one Murray Saka, an old friend of Peres and long time acquaintance of Ehrlich. What follows is an account of the testimony Saka gave on direct examination.

Saka moved from Brooklyn to Los Angeles in November, 1977 in large part to be closer to his friend Peres. He had been the proprietor of a camera and electronics store in New York, and he continued to sell camera and electronic equipment after moving, first at his own store and then at a store called New West Imports. In February, 1978 he received a phone call from Ehrlich offering to sell him two hundred movie projectors. They eventually agreed upon a $10,000 price, and Ehrlich told Saka that "his partner," Seifert, would be in Los Angeles shortly and would stop by Saka's store to pick up the $10,000 payment. Seifert did pick up the money and later delivered the projectors to Saka in a U–Haul truck.

Later in February, Saka received another call from Ehrlich, this time promising "a very good deal." Saka flew to Phoenix with $30,000 in his pocket "to buy the deal." In the Videoflex storeroom he examined the photographic merchandise offered to him for sale and agreed upon a price of $26,300. He paid the money over to Seifert and Ehrlich who counted it out together. Saka testified that he had borrowed a total amount of $75,000 from a friend although he had only taken $30,000 with him to Phoenix on this occasion.

In March, Saka received a third phone call from Ehrlich offering more merchandise for sale. Saka "got very excited because of the money [he] had borrowed" and he drove to Phoenix to examine the merchandise. He and Ehrlich agreed upon a price of about $39,000 and Saka paid over the money in cash to Ehrlich and Seifert. Finally, on the following morning, Saka made his last purchase from Videoflex when he bought calculators from Ehrlich for $12,000. At that time, Saka "was deeply concerned about this money that was involved because [he] had to return it to whom [he] had borrowed it from."

On cross–examination, Saka was asked whether he had told the FBI that he had borrowed the money from a "loan shark" or from a "Shylock"; why he had borrowed $75,000 when the pending transaction with Videoflex only required $30,000; what rate of interest he was paying; whether he had dealt with this "loan shark" on previous occasions. Saka answered all of these questions. But when asked to give the name of his lender, he refused: "I'd rather not say for fear of my own life."

The court initially sustained an objection by the prosecution to this line of questioning as collateral, but permitted Seifert's counsel to make a written offer of proof as to the relevance of the question during the recess. In the offer of proof, Seifert's counsel explained that it was the defense theory that Saka and Peres were the actual partners in Videoflex–not Ehrlich and Seifert, and that the money to start Videoflex had come from Saka's own sources, including a store called Studioflex that Saka had owned in Brooklyn and closed before moving to Los Angeles, and not from a loan. Although he found the offer of proof "somewhat thin," the judge decided to allow the question to be put again to Saka, but not in the presence of the jury. Saka was recalled to the stand and declined to name the "loan shark" on the ground that his answer might incriminate him. The cross–examination before the jury then continued. Later in the proceedings the trial court twice denied appellants' motion to strike Saka's testimony because of his re-

fusal to answer this one question on cross–examination.

Seifert and Ehrlich argue that the trial court committed five separate errors in its treatment of Saka's invocation of his Fifth Amendment privilege.

## A. The Presence of the Jury.

First, Seifert and Ehrlich argue that the court erred in not requiring that Saka's assertion of his Fifth Amendment privilege be before the jury.

In deciding this question, we put aside cases rejecting a defendant's attempt to call a co–defendant to the stand for the purpose of having the co–defendant assert his privilege before the jury. *E.g., United States v. Espinoza*, 9 Cir., 1978, 578 F.2d 224, 228. A defendant has an absolute right not to take the stand.

On the other hand, a non–party witness cannot refuse to take the stand. His privilege arises only when he asserts it as to a question put to him, and it is for the court to say whether he is entitled to the privilege. *United States v. Bautista*, 9 Cir., 1975, 509 F.2d 675, 678 (dictum). *See also* J. Weinstein & M. Berger, 3 Weinstein's Evidence, ¶ 611[04] at 611–49 (1978). We have held that a non–party witness cannot be called solely to have him claim his privilege before the jury. *United States v. Licavoli*, 9 Cir., 1979, 604 F.2d 613, 624; *United States v. Espinoza*, 9 Cir., 1978, 578 F.2d 224, 228 (dictum). But we have not decided the question here presented.

In *United States v. Gay*, 9 Cir., 1978, 567 F.2d 916, 920, we said in dictum that a non–party who testifies can be required to invoke the privilege before the jury. Judge Weinstein agrees, see Weinstein, *supra*, at p. 611–53. He cites no authority for this proposition, however, and we have found none.

We conclude that the judge should have allowed counsel to put the question to Saka before the jury. Doing so does not burden Saka's privilege. He is not on trial, and his invoking the privilege is not being

used against him. If he were later indicted and tried, his invocation of the privilege could not be used against him. Nor would his invocation of the privilege be the sort of major event, to which the jury might give undue weight, that the complete refusal of a witness to testify might be. Here, Saka had answered every other question put to him. His refusal to answer the one question about the identity of the lender would be a form of impeachment. *See United States v. Hearst*, 9 Cir., 1977, 563 F.2d 1331, 1341–1342; *Caminetti v. United States*, 1917, 242 U.S. 470 at 493–495, 37 S.Ct. 192, 197, 61 L.Ed. 442; *United States v. Brannon*, 5 Cir., 1977, 546 F.2d 1242, 1247; *United States v. Weber*, 3 Cir., 1970, 437 F.2d 327, 334–335. These cases involved defendants who took the stand thereby waiving the privilege, but invoked it as to certain questions. The impeachment rationale, however, is applicable to this case.

However, we would not reverse on this ground in this case. The defendants had ample opportunity in the course of their lengthy cross–examination of Saka and in their examination of other witnesses to impeach Saka's testimony. Further impeachment by having Saka refuse to answer before the jury would have been merely cumulative.

### B. *Waiver of the Privilege.*

■ Second, Seifert and Ehrlich argue that Saka waived his Fifth Amendment privilege as to the name of his lender by his testimony during direct examination and thus that the trial court erred in not ordering Saka to answer the question on cross–examination.

We hold that Saka did not waive his Fifth Amendment privilege. We recognize that there is a distinction between a non–defendant witness called to testify and a defendant who voluntarily takes the stand. *United States v. Panza*, 9 Cir., 1979, 612 F.2d 432, 436.

A non–party witness who takes the stand and testifies, as Saka did in this case, obviously waives whatever privilege he may have had to refuse to answer the questions that he answers. He has not, however, waived his privilege as to all other questions that may be put to him. He may have waived his privilege as to questions on cross–examination directly relating to the matters about which he testified on direct examination, but the extent of such a waiver is in doubt. *Weinstein, supra,* ¶ 611[04]. Our rule is that, whatever the standard of waiver for defendants who voluntarily testify, "an ordinary witness may 'pick the point beyond which he will not go,' and refuse to answer any questions about a matter already discussed, even if the facts already revealed are incriminating, as long as the answers sought may tend to *further* incriminate him. *Shendal v. United States*, 312 F.2d 564, 566 (9 Cir. 1963)." *In re Master Key Litigation*, 9 Cir., 1974, 507 F.2d 292, 294. (citation omitted). Before the trial judge, the parties agreed that Saka's answer would have been incriminating; it seems certain that the answer would have incriminated Saka "further" than his direct testimony. Thus, he was entitled to refuse to answer.

### C. *Denial of Motion to Strike Saka's Testimony.*

Third, the appellants argue that the court should have struck Saka's testimony after he invoked his Fifth Amendment privilege. The court denied appellants' motion to strike, finding that the question Saka refused to answer was "collateral" and that it was not sufficiently material to the defense to merit the extreme sanction of striking Saka's testimony.

■ Where a witness asserts a valid privilege against self–incrimination on cross–examination, all or part of that witness's testimony must be stricken if invocation of the privilege blocks inquiry into matters which are "direct" and are not merely "collateral." *See, e. g., United States v. Williams*, 9 Cir., 1980, 626 F.2d 697, 702.

The distinction between matters which are "collateral" and those which are "direct" is not precise or easy. It can be drawn only by reference to the particular

facts of the particular case, and we recognize that "[a] trial court has wide discretion to determine whether a witness's testimony must be stricken because cross–examination was restricted." *United States v. Star,* 9 Cir., 1972, 470 F.2d 1214, 1217–18. The ultimate questions on appeal are "whether the defendant has been deprived of his right to test the truth of the direct testimony," *Fountain v. United States,* 5 Cir., 1967, 384 F.2d 624, 628, citing *United States v. Cardillo,* 2 Cir., 1963, 316 F.2d 606, 611, and whether answers to the particular questions "would . . . have undermined the government's case." *United States v. Williams, supra,* 626 F.2d at 702, quoting *United States v. Norman,* 9 Cir., 1968, 402 F.2d 73, 77.

■ Appellants argue that the question put to Saka as to the identity of his lender was not collateral but went to the heart of the defense theory in this case. The defense theory was that Saka and Peres–not Seifert and Ehrlich–established Videoflex as a fraud. They contend that Saka supplied $75,000 to Peres to begin the business and that once Peres was caught they both attempted to shift blame to Seifert and Ehrlich, who were but employees. The defense pointed to several facts which they argued supported their theory: Saka and Peres were old friends; Saka had operated a business in New York similar to Videoflex called Studioflex and it had gone out of business, apparently in debt to its creditors, near the time Videoflex opened; according to a Dun & Bradstreet, Inc. form Videoflex had a starting capital of $75,000; Saka had moved to the west coast near the time Videoflex opened. In their offer of proof the defense argued that Saka had not obtained the $75,000 from a lender but from his own sources, "i. e. Studioflex" and that this money had been given to Peres directly to start Videoflex. On appeal appellants further argue that Saka never purchased merchandise from Ehrlich and Seifert but rather received it as a return on his initial investment in Videoflex.

But Seifert and Ehrlich were not hindered in the presentation of that defense theory by Saka's invocation of the Fifth Amendment. Indeed, counsel made an able presentation of the theory in their closing statements to the jury and repeatedly attempted to strengthen it in the course of trial. Nor was the source of the money important to the development of the theory. Even if Saka had revealed that the money had not in fact been borrowed, this would not have shown, except by the most extended and poorly supported set of inferences, that Saka had "invested" $75,000 in Videoflex in partnership with Peres and thus, by inference, had not made the purchases from Seifert and Ehrlich which he described on his direct examination. *See Fountain v. United States,* 5 Cir., 1967, 384 F.2d 624, 629. No such extended set of inferences was involved in *United States v. Cardillo, supra,* upon which appellants rely for support. At best Saka's answer would have permitted Seifert and Ehrlich to have tested Saka's credibility as to a matter on which he gave direct testimony. But counsel had ample opportunity to challenge the credibility of Saka's direct testimony. Over the course of a lengthy cross–examination this was the only question that Saka refused to answer.

The trial court did not err in refusing to strike Saka's testimony.

D. *Sixth Amendment Right to Confrontation.*

■ Seifert and Ehrlich argue that Saka's refusal to answer one question put to him on cross–examination deprived them of their Sixth Amendment rights. They rely upon *Davis v. Alaska,* 1974, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, which involved refusal to permit cross–examination of a witness as to his conviction of a felony, for the purpose of impeachment. But here Seifert and Ehrlich made no attempt to question Saka as to prior convictions. The Court in *Davis* recognized that the trial court has a duty to protect a witness from "an attempted invasion of his constitutional protection from self–incrimination, properly invoked." 415 U.S. at 320, 94 S.Ct. at 1112. That is what the court did

here. Appellants' Sixth Amendment rights were not violated in this case. Seifert and Ehrlich were able fully to present their defense.

### E. *The District Court's Instruction to Saka.*

The trial court instructed Saka: "Now Mr. Saka, I am told that you may wish to invoke the Fifth Amendment on grounds that your answer may tend to incriminate you or that you may have serious apprehension of serious bodily harm. Now if that be so I shall afford you a reasonable opportunity to consult counsel before making an answer." Saka then answered: "I refuse to answer that question on the grounds that it may incriminate myself."

■ Fear of reprisal is not a valid basis upon which to assert the Fifth Amendment privilege. *United States v. Panza, supra,* 612 F.2d at 437. However, although the court's instruction was faulty, Saka explicitly placed his assertion of the privilege on the basis that to answer the question might be to incriminate himself. Moreover, later in the trial the trial court expressly asked the parties whether they wished to return Saka to the stand "for examination to determine whether his claim of incrimination under the Fifth Amendment is tenable." Appellants assured the court that "we all are of the same view that his invocation of the claim is valid." The trial court's error in its instruction to Saka was harmless error.

### III. *Severance.*

■ At the close of the government's case, Seifert made a motion under F.R. Crim.Pro. 14 for severance. His counsel told the court that he had been informed the previous evening that Ehrlich would not testify. During the preparation of the case and during trial Seifert's counsel had been specifically told by Ehrlich and by Ehrlich's lawyer that Ehrlich would testify and exculpate Seifert. The evidence offered against Seifert during the course of the trial was weak, and Ehrlich's testimony was critical to Seifert's defense. An offer of proof was made to the court outlining Ehrlich's testimony: He would testify that he received no money from Seifert to finance Videoflex and that he did not tell Peres that the money to start Videoflex came from Seifert; that the argument between Seifert and Peres, at which Ehrlich was present, related to Peres bringing cocaine into the store rather than to what Peres claimed; that Ehrlich was never present when Saka paid cash to Seifert, and Saka did not pay cash to Ehrlich; and that Seifert was an employee of Videoflex, not an owner. This offer of proof was supported by Ehrlich's affidavit.

The trial court ruled that the severance motion was "diligently pursued and was made in good faith" and "that there is a high probability that Ehrlich would have testified on behalf of Seifert at a separate trial." However, the court denied the motion for severance, stating that "although the testimony might have been favorable to Seifert, its exclusion was not manifestly prejudicial." We cannot agree.

■ A motion for severance is addressed to the trial court's discretion. *United States v. Lutz,* 9 Cir., 1980, 621 F.2d 940, 945. On appeal, the defendant must show that failure to sever was so manifestly prejudicial that it outweighed the dominant judicial concern with judicial economy and compelled the exercise of the trial court's discretion to sever. *United States v. Armstrong,* 9 Cir., 1980, 621 F.2d 951, 954. To make a showing of such "manifest prejudice" a defendant must show a violation of one of his substantive rights such as his right to present an individual defense. *United States v. Escalante,* 9 Cir., 1980, 637 F.2d 1197, 1202.

"When the reason for severance is the asserted need for a codefendant's testimony, the defendant must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify and that the testimony would be favorable to the moving defendant." *United States v. Vigil,* 9 Cir., 1977, 561 F.2d 1316, 1317. Seifert made such a showing here.

The trial court must also consider the possible weight and credibility of the testimony and the economy of severance at the point the motion was made. *United States v. Kaplan*, 9 Cir., 1977, 554 F.2d 958, 966. Peres, the main witness against Seifert, was a co–defendant testifying under a plea agreement with the government. Ehrlich would have rebutted virtually the whole of Peres' testimony as it related to Seifert. Ehrlich's testimony would also have directly contradicted Murray Saka's testimony that he had paid Ehrlich and Seifert for certain purchases of Videoflex merchandise. Other than Seifert himself, Ehrlich was the only individual in a position to rebut directly the government evidence of Seifert's knowing participation in the scheme. Unrebutted testimony remaining would not of itself show Seifert to be more than an employee of Videoflex.

Considerations of judicial economy do not outweigh the seriousness of the prejudice to Seifert, who was denied the right to present important exculpatory evidence. Denial of his motion to sever requires reversal.

### IV. *Grand Jury Indictment.*

Appellants contend that inequities in the grand jury's indictment compel a judgment of acquittal or a new trial.

■ They claim that it was improper to present only the hearsay testimony of an F.B.I. agent to the grand jury. However, an indictment may be based solely on hearsay evidence, *Costello v. United States*, 1956, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, even where percipient witnesses could have been produced, *United States v. Short*, 9 Cir., 1974, 493 F.2d 1170, 1173.

■ They argue that the government failed to present evidence favorable to them to the grand jury. This is not a basis for dismissing the indictment, *United States v. Kennedy*, 9 Cir., 1977, 564 F.2d 1329, 1335–38.

They argue that the F.B.I. agent's testimony was misleading and inaccurate. The instances that they cite are not sufficiently flagrant to necessitate dismissal of an otherwise valid indictment. *United States v.*

*Kennedy, supra,* 564 F.2d at 1338. *See also, United States v. Vargas–Rios*, 9 Cir., 1979, 607 F.2d 831, 835.

The appellants argue that the prosecution failed to reveal to the grand jury, that the prosecution witness, Peres, had given inconsistent statements regarding the existence of the bankruptcy scheme and that he had a prior conviction relating to marijuana. The prosecution was not required to present this evidence to the grand jury, and the appellants had no right to have it presented. *United States v. Lasky*, 9 Cir., 1979, 600 F.2d 765, 768; *United States v. Y. Hata and Co., Ltd.*, 9 Cir., 1976, 535 F.2d 508, 512.

### V. *Evidence of a Prior Act of Misconduct of Ehrlich.*

■ Ehrlich claims that questioning of the witness Peres by the prosecution as to Ehrlich's participation in Century City Enterprises–a stereo and electronics retail operation which went out of business owing its suppliers substantial sums–was so prejudicial as to require reversal despite the trial court's cautionary instruction. The court permitted the questioning after conducting a hearing on the admissibility of the evidence, in the absence of the jury. Initially, the trial court ruled that the evidence was admissible under Rule 404(b) F.R.Ev. But after hearing Peres' testimony as to this matter and after further objection by Ehrlich's counsel, the court decided that the evidence was in fact inadmissible. Accordingly, the court instructed the jury "not to consider any evidence concerning Mr. Ehrlich's connection with Century City for any purpose whatsoever and nothing should be implied in any way to his disadvantage. The evidence given in no way showed misconduct or any sort of crime, or criminal or unlawful conduct or activity. And as I now indicate to the jury, disregard it for all purposes." After reviewing Peres' testimony on this matter, we find that the trial court's instruction to the jury cured any possible prejudice caused to Ehrlich.

In No. 79–1405, the judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

In No. 79–1458, the judgment is affirmed.