UNITED STATES of America ex rel.
Joe L. ASHFORD, Petitioner,

v.

DIRECTOR, ILLINOIS DEPARTMENT
OF CORRECTIONS, Respondent.

No. 87 C 5094.

United States District Court,
N.D. Illinois, E.D.

Feb. 8, 1988.

Bruce E. Mosbacher, State Appellate Defender's Office, Chicago, Ill., for petitioner.

Arleen C. Anderson, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Following a bench trial in state court, Joe L. Ashford was convicted of home invasion, armed robbery and residential burglary. The trial court sentenced Ashford to three concurrent prison terms of seven years. He lost on appeal and unsuccessfully petitioned the Supreme Court of Illinois for review. He now petitions this Court under 28 U.S.C. § 2254(a) for a writ of habeas corpus. For the reasons stated below, his petition is denied.

### I

Because the state appellate court affirmed in an unpublished opinion, *People v. Ashford*, 149 Ill.App.3d 1157, 112 Ill.Dec. 943, 514 N.E.2d 606 (1st Dist.1986), we set forth the facts in greater detail than we would usually do. Additionally, we will set forth passages from the transcript as are relevant in our discussion on the merits.

Ashford was found guilty of home invasion, armed robbery and burglary following a bench trial for robbing Juan Irizarry of a gold chain and ring in his home. At the trial, Juan Irizarry testified that around 12:45 p.m. on October 24, 1982, while he was in his apartment with his wife Fretta Tunstill and their five-year old son Juan, Jr., he heard a knock at the door. Tunstill asked, "Who is it?" and a voice responded, "Lamont." Irizarry opened the door and saw Lamont Harris, Eddie Williams and the petitioner Ashford. Harris pulled out a revolver and said, "It goes this way sometimes." Williams held a sawed-off shotgun to Irizarry's chest. Petitioner Ashford stood behind the other two offenders in the hallway outside the apartment. The three took a gold chain from around Irizarry's neck and a gold ring off his finger. Tunstill fled out the back door of the apartment with Juan, Jr. Irizarry also left the apartment through the back door. He did not call the police to report the incident himself because he and his wife thought that the men would return. The crime was only reported later that day when Harris came back to the apartment with the police officers in a move to exonerate himself from the robbery.

While on the stand, Irizarry admitted that in 1976, he was convicted of selling controlled substances; that he had previously pled guilty to a charge of discharging a weapon; that he was found guilty of failing to register a gun in the City of Chicago; and that at the time of this trial, there were two further charges pending against him for the sale of controlled substances. The penalty for each of the offenses charged was from 6 to 30 years. On cross-examination, Irizarry testified that he did not expect any leniency in return for his testimony, and that the state had not promised to reduce the pending charges. However, the court did sustain the state's hearsay objections to defense counsel's further questioning into the pos-

sibility that Irizarry's attorney was currently negotiating a deal. Irizarry further stated that he was not a drug addict, although he admitted that he had used marijuana and cocaine approximately once a week during the year preceding trial.

The trial court allowed Irizarry to invoke his Fifth Amendment privilege against self-incrimination in response to several questions concerning the presence of drugs in his apartment at the time of the robbery, and it allowed him to avoid questions regarding any other drug deals between himself and Lamont Harris, Ashford's co-defendant.

Irizarry's wife Fretta Tunstill's testimony at trial substantially corroborated that of Irizarry. She saw Harris and Williams after Irizarry opened the apartment door and saw Williams point a shotgun at Irizarry. She did not see petitioner Ashford, however, until she was in the gangway on the ground floor as he was walking away from the apartment building. He was 15 to 20 feet ahead of Harris and Williams and looked back towards them as he walked.

Police Officer Christopher Mancari testified that at 7:45 p.m. on October 24, 1982, he received a telephone call at the police station from Harris. Harris asked Mancari to come to his home because he had some information to give him. When Mancari and his partner Officer Linda Paraday arrived at Harris' home, Harris asked them if they wanted a big bust. Mancari testified that Harris told him that four other men, including petitioner Joe Ashford, threatened Harris to force him to participate in the robbery of Irizarry. Harris offered to go with the officers to Irizarry's apartment to show how it happened. When they arrived at the apartment, Irizarry and Harris began shouting at each other. They were at the apartment approximately 30 minutes before Mancari asked Irizarry if he wanted to sign a complaint against Harris. He instructed other officers to arrest petitioner Ashford. At the police station that eve-ning, Irizarry identified petitioner as one of his assailants.

After approximately a month-long on-and-off bench trial, the court found both defendants guilty on all counts with the following ruling in open court:

> This trial has lasted almost a month. It's been heard from time to time. And during that month I have reviewed all of my notes concerning the testimony.
>
> One of the major thesis which the defense has brought forward is that *the defendant [sic]-victim is a drug dealer and had drugs in his apartment.* And even accepting that thesis, though I don't even accept—even accepting that thesis though, I would say that I do not believe that it is critical at all to the decision of the Court in this case. But accepting that thesis, the Court still finds that the State has proved its case beyond a reasonable doubt and that both defendants are guilty of all counts as charged in the Information. Accordingly, the Court finds them guilty.

(TR. 525) (emphasis added).

## II

Ashford raises three issues in this petition. Two allege violations of his Sixth Amendment right of confrontation and the other concerns the State Court's failure to allow the prosecuting attorney to be called as a defense witness.

### a.

Ashford contends his Sixth Amendment right of confrontation was violated when the trial court repeatedly allowed the State's key witness Irizarry to invoke the Fifth Amendment upon cross-examination and by limiting defense counsel's attempt to determine whether the State's key witness had knowledge of ongoing negotiations between the witness' attorney and the State on criminal charges pending against the witness. First, we address Irizarry's invocation of the Fifth Amendment.[1]

---

1. Petitioner sets forth the following as a representative sample of defense counsel's attempted cross-examination of Irizarry:

   Q. [By defense counsel Ptacek] You have been arrested twice this year for selling narcotics?
   A. [Irizarry] I refuse to answer that question.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. U.S. Const.Amend. VI. "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, 'means more than being allowed to confront the witness physically.' Indeed, ' "[t]he main and essential purpose of confrontation is *to secure for the opponent* the opportunity of cross-examination." ' " *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674

(TR. 212).

Q. Did the police confiscate drugs out of your apartment on South Bishop? ...

MR. SOBOL: [Mr. Irizarry's attorney] I would advise Mr. Irizarry to take the Fifth Amendment on that question.

A. I take the Fifth.

(TR. 244, 247).

Q. You said that you recognize the defendant, [co-defendant] Lamont Harris, is that correct?

A. That is correct.

Q. You sold him drugs, isn't that correct?

A. I'm going to take the Fifth.

Q. Did you sell him drugs?

MR. SOBOL: Assert the Fifth. For the record, I am advising Mr. Irizarry to assert the Fifth Amendment rights.

THE COURT: The Court denies the defense request to make the defendant [sic] answer that question.

(TR. 256).

Q. Did you ever have any drugs in the apartment?

A. I refuse to answer that question. I want to take the Fifth Amendment.

Q. Isn't that the reason this whole incident developed, because of over narcotics?

A. No.

Q. Isn't it a fact that no property was taken from you, it was just a dispute over buying narcotics?

A. It was property taken from me.

Q. What was it, drugs or PCP?

A. It was a gold chain and a gold ring.

Q. But you had narcotics in the apartment, is that correct?

A. That is incorrect.

Q. Is that why you didn't tell the police because you wanted to hide those drugs?

A. I want to take the Fifth.

THE COURT: Okay.

BY MR. PTACEK: You testified that you didn't call the police because you were afraid, isn't that what you said?

BY THE WITNESS:

A. That is what I said.

Q. It had nothing to do with the drugs?

A. Nothing.

Q. So there were no drugs in the apartment, is that right?

A. I want to take the Fifth.

MS. CAGNEY: Objection, asked and answered.

MR. PTACEK: I want the record to reflect that the attorney is talking to the witness when he is testifying.

MR. SOBOL: Let the record show that I am advising the witness to take the Fifth Amendment to any question that relates to drugs.

(TR. 269–270).

BY MR. PTACEK:

Q. Getting back to October 24, 1982, do you recall that date, sir?

BY THE WITNESS:

A. Yes.

Q. And you said that an incident occurred but you did not call the police, is that correct?

A. That is correct.

Q. You were afraid, is that your reason?

A. That is correct.

Q. Were you afraid the police were going to find drugs in your apartment?

MR. SOBOL: Objection.

BY THE WITNESS:

A. I am taking the Fifth.

BY MR. PTACEK:

Q. Did you have drugs in your apartment?

A. I am taking the Fifth.

Q. Did you have a conversation before you testified with the State's Attorney, Ms. Cagney?

A. Did I have?

Q. A conversation with the State's Attorney, Ms. Cagney?

A. We talked about the case.

Q. Did you tell her that you did not call the police for eight hours after this occurred?

A. Yes.

Q. Did you tell her the reason was because there were drugs in the apartment?

A. I want to take the Fifth.

Q. Did you tell her that you sold drugs out of the apartment?

A. I want to take the Fifth.

Q. Did you tell her that there were drugs in the apartment?

A. I want to take the Fifth.

Q. Did you tell her you were a dealer in narcotics?

A. I take the Fifth.

Q. Did you tell her you sold the drugs?

A. I take the Fifth.

Q. Did you tell her you sold drugs to Lamont Harris?

A. I take the Fifth.

Q. Did you tell her that this whole case involved an argument over drugs?

A. I take the Fifth.

(1986) (citations omitted). In this case, Ashford contends that because Irizarry repeatedly invoked the Fifth Amendment, Ashford could not explore Irizarry's motivation and bias to falsely accuse Ashford:

> The defendant was thus prevented from exploring with the State witness the most important question in the case—What happened in the witness' apartment during the early afternoon on October 24, 1982. Was there an armed robbery or, was there a drug deal that went awry which provided motive and bias for Irizarry to falsely accuse petitioner of being a participant in an armed robbery?

(Pet.Memo in Support at 8).

Petitioner does not argue that he was unable to raise issues which reflect only upon Irizarry's credibility, but rather, that he was unable to explore his "aborted theory of defense that the encounter between Ashford and Irizarry was not a home invasion or armed robbery, but a drug deal gone awry." (Pet.Memo in Support at 10). Accordingly, he suggests that Irizarry's entire testimony should have been stricken, citing *Carlos v. Wyrick*, 753 F.2d 691 (8th Cir.1985); *United States v. Garrett*, 542 F.2d 23 (6th Cir.1976).

It is clear, however, that where a witness asserts a valid privilege against self-incrimination on cross-examination, if invocation of the privilege blocks inquiry into "collateral" matters, the assertion is not preju-

dicial to the defendant's Sixth Amendment rights. *United States v. Norman*, 402 F.2d 73, 77 (9th Cir.1968), *cert. denied*, 397 U.S. 938, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970); *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). *See also United States v. Seifert*, 648 F.2d 557, 561 (9th Cir.1980); *Dunbar v. Harris*, 612 F.2d 690, 692 (2d Cir.1979).

The distinction between matters which are "collateral" and those which are "direct" is not often precise or easy. *Seifert*, 648 F.2d at 561. It can be drawn only by reference to the particular facts of the particular case. *Id.* In the present case, Ashford contends defense counsel's inquiries were all into direct matters and not collateral matters; however, the transcript reveals conflicting motives as to defense counsel's questioning.[2] A review of the transcript citations set forth by petitioner reveals two separate areas of questions which were met with Fifth Amendment responses: first, those areas pertaining to the presence of drugs in Irizarry's apartment the day of the robbery, and second, those areas pertaining to Irizarry's prior acts of misconduct, i.e. selling drugs to Lamont Harris, Ashford's co-defendant, and the pending drug charges. We find that inquiries directed to the first area are not collateral because whether Irizarry had drugs in his apartment on that day concerns the events of October 24, 1982.

(TR. 287–289).

**2.** For example, with respect to questions regarding whether Irizarry was a dope dealer, defense counsel stated to the court: "The question of whether or not [Irizarry] is a dope dealer goes to the very heart of whether or not his credibility is good or bad, whether or not his testimony is good or bad." (TR. 223). In addition, in reference to defense counsel's inquiries into Irizarry's then pending indictments, defense counsel stated:

> He has put, by getting on that witness stand and testifying, he has put his credibility into view. By reason of putting his credibility into view, he cannot fall back on the Fifth Amendment because by all rights he has already waived his Fifth Amendment rights by taking and getting on the stand. He can't take and have his cake and eat it too. If he is going to testify and be a State witness then he is going to take and put his credibility on the line then

we have a right to bring out the fact that he is a dope peddler and then we can bring out the fact that he is charged with it and I think we have a right to know whether he did or did not do that and cannot hide behind the Fifth Amendment.

(TR. 214).

Then with respect to questions regarding why Irizarry did not call the police to report the crime, defense counsel indicates the inquiry was aimed at direct matters:

> It is our contention, which was submitted to us by the State, that this man was selling drugs and there were drugs in the apartment and for that reason he did not call the police. That is why he didn't call the police for seven hours and if true, Judge it would support, it would be exculpatory to the defendant in that it would support defense theory of the case regarding these circumstances.

(TR. 282).

However, we find that questions pertaining to Irizarry's prior bad acts, such as previous drug sales to Harris and the pending drug charges, were inquiries into collateral matters, the purpose of which as stated by defense counsel, was solely to impeach Irizarry's credibility. Accordingly, we find that Irizarry's invocation of the Fifth Amendment as to matters in the second area does not implicate Ashford's Sixth Amendment right to confrontation. The witness was forced to invoke the Fifth Amendment in front of the trier of fact. The trier of fact had a full opportunity to infer from that invocation that Irizarry's answers would have been affirmative.

■ This leaves the inquiries we found not to be collateral, i.e. inquiries as to the presence of drugs in Irizarry's apartment on the day of the robbery. Ashford implies that he was prevented from inquiring into many more areas concerning the events of October 24, 1982, however, as the excerpts cited by petitioner reflect, petitioner was able to inquire into the facts surrounding the robbery, and he was able to raise his theory of defense:

Q. Did you ever have any drugs in the apartment?

A. I refuse to answer that question. I want to take the Fifth Amendment.

Q. Isn't that the reason this whole incident developed, because of over narcotics?

A. No.

Q. Isn't it a fact that no property was taken from you, it was just a dispute over buying narcotics?

A. It was property taken from me.

Q. What was it, drugs or PCP?

A. It was a gold chain and a gold ring.

Q. But you had narcotics in the apartment, is that correct?

A. *That is incorrect.*

Q. Is that why you didn't tell the police because you wanted to hide those drugs?

A. I want to take the Fifth.

THE COURT: Okay.

Q. You testified that you didn't call the police because you were afraid, isn't that what you said?

A. That is what I said.

Q. It had nothing to do with the drugs?

A. *Nothing.*

Q. So there were no drugs in the apartment is that right?

A. I want to take the Fifth.

(TR. 269–270) (emphasis added). Although Irizarry did say he wanted to take the Fifth, he also answered the questions. For example, when asked if he had drugs in the apartment on the day of the robbery, he said, "That is incorrect." When asked the same question again, he claimed the Fifth, but as the State correctly noted in its objection as "asked and answered," Irizarry had previously answered the question. Although Irizarry took the Fifth in response to the question, "Is that why you didn't tell the police [until 8 hours later] because you wanted to hide those drugs?" (TR. 269–70). He then answered the question, "It [failing to report the robbery] had nothing to do with the drugs?" with an affirmative, "Nothing." Thus, contrary to Ashford's contention, he did succeed in raising his theory of defense, that is, there was not a robbery, only a busted drug deal. Irizarry denied this and maintained his position that he was robbed of a gold chain and ring.

Even though Irizarry indicated that drugs were not in his apartment on one question (TR. 269), he did take the Fifth on other occasions when this issue was raised. However, defense counsel was able to ask Irizarry and his wife why they did not report the incident on their own. Irizarry indicated that the reason he did not call the police was because he was scared that the men would return. (TR. 249–50). Irizarry's wife also testified to this. (TR. 32). Thus, the only area defense counsel was not able to inquire into concerning the events of October 24, 1982, was the presence or absence of drugs in Irizarry's apartment. We would be very reluctant to find this alone violated Ashford's Sixth Amendment right to confrontation. Even if there were drugs in Irizarry's apartment, it does not mean Irizarry could not have

been robbed anyway. However, because it would be relevant to petitioner's theory of defense, i.e. that it was all a busted drug deal, we will assume that stymieing Ashford from asking these questions violates the Sixth Amendment, and we will discuss below whether it was harmless error.

■ Ashford also contends his Sixth Amendment right of confrontation was violated when the trial court improperly sustained the State's hearsay objection to defense counsel's attempt to determine whether the State's key witness Irizarry had knowledge of ongoing negotiations between his attorney and the State on the criminal charges pending against Irizarry. The following exchange took place on cross-examination:

Q. Sir, you testified that you have two cases pending in court, is that correct?

A. That is correct.

Q. One occurred on February 3rd, 1984 and one occurred on February 24, 1984, is that correct?

A. That is correct.

\* \* \* \* \* \*

Q. Do you know the penalties for those offenses?

A. I believe so.

Q. It's from 6 to 30 years, isn't that correct?

A. I believe so.

Q. These are class "X" felonies, is that correct?

A. I believe so.

Q. And no probation is possible on those offenses unless the State reduces, is that correct?

STATE: Objection.

COURT: Objection sustained.

\* \* \* \* \* \*

Q. Are you called as a witness by the State's Attorney of Cook County?

A. Yes.

Q. And have you talked to them about your other cases?

A. It was brought up.

Q. Do you expect any leniency on those cases?

A. No, I don't.

Q. You are just doing this out of your own freewill?

A. Because I was robbed.

Q. Did they promise you to reduce those charges?

A. No.

Q. You don't think you are going to receive any consideration?

A. No.

Q. But you have brought up to the State's Attorney that you have those pending?

A. They brought it up to me.

Q. Have you brought it up to the State's Attorney in the other courtroom?

A. In the other courtroom?

Q. Yes.

A. [Judge] Heyda's courtroom?

Q. Yes.

A. Can you repeat the question?

Q. Have you informed the State's Attorney and [sic] Judge Heyda's courtroom that you are a witness for the State in another courtroom?

A. No, I haven't.

Q. Has your attorney?

A. I believe not.

Q. Has he talked to the State's Attorney in Judge Heyda's courtroom?

THE STATE: Objection. It calls for a hearsay response.

THE COURT: Objection sustained.

Q. Do you know whether he has talked to them or not?

THE STATE: Objection.

THE COURT: Sustained.

Q. Are you a drug dealer?

(TR. 232–237). As the transcript shows, defense counsel made no further attempts to investigate this line of questioning and made no offer of proffer before going on to other areas. It is clear that the last question pertaining to whether Irizarry had knowledge of his attorney's negotiations was improperly sustained if the basis of the objection was hearsay. Petitioner Ashford does not allege, nor does he request a hearing on the matter, that there was any "deal" between the State and Irizarry.

Thus, the most that Ashford could have gotten out of Irizarry on this issue was whether there were ongoing negotiations through which Irizarry hoped to get a deal. If Irizarry gave his testimony with the anticipation that he would receive favorable treatment on his pending charges, then questions directed to the ongoing negotiation would be proper to reveal Irizarry's bias in testifying. Ashford contends that "had the defense been able to establish Irizarry's counsel had began negotiations on Irizarry's pending felony charges and that Irizarry was aware of those negotiations, the defense would have been in *an even* better position to develop the theory that Irizarry's testimony was not truthful because it was influenced by an expectation of leniency on the pending charges." However, this does not mean that Ashford's Sixth Amendment right to confrontation was violated. Defense counsel was permitted to question Irizarry extensively on the pending charges and was able to ask Irizarry if he expected leniency. In *Van Arsdall*, 106 S.Ct. 1431, 1435, the trial court prohibited all inquiry into the possibility that the witness in that case would be biased as a result of the State's dismissal of his pending public drunkenness charge. In contrast, in this case the pending charges against Irizarry were one of the main topics on cross-examination. In no way was the existence of those charges kept from the trier of fact. Thus, there was more than enough basis from which the judge could have inferred that Irizarry thought that his testimony would earn him favorable treatment as to his pending drug charges. Accordingly, we are unable to find that the slightly restricted cross-examination on this issue amounted to a violation of Ashford's Sixth Amendment right of confrontation. The "Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." *Van Arsdall*, 106 S.Ct. at 1435

(citing *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985)).

Even if we were to assume that either of the alleged confrontation errors stated a violation under the Sixth Amendment, we would still have to determine whether the errors were harmless beyond a reasonable doubt. *Van Arsdall*, 106 S.Ct. at 1438. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* If we assume the damaging potential of the cross-examination is fully realized, this means first, that Irizarry had drugs in his apartment on the day that he was robbed.[3] Secondly, we assume that Irizarry was aware of ongoing negotiations between his lawyer and the State concerning Irizarry's pending drug charges.

██ According to *Van Arsdall*, in determining whether an error is harmless in a particular case, we need to consider the following factors:

> [T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

106 S.Ct. at 1438. First, we examine the significance of an admission that Irizarry had drugs in his apartment the day he was arrested. Initially, we know for a fact that this admission would not have influenced the trier of fact, in this case the judge, because she said as much in her finding of facts:

> One of the major thesis which the defense has brought forward is that the defendant [sic]-victim is a drug dealer and *had drugs in his apartment.* And even accepting that thesis … I would say that I do not believe that it is critical

---

**3.** We do not assume the entire scenario that petitioner sets forth, i.e. that Irizarry had drugs because it was a busted drug deal or that he did not call the police because of the drugs, because these were questions that Irizarry answered. Thus, we assume only that Irizarry had drugs in his apartment on the day he was robbed.

at all to the decision of the Court in this case.

(TR. 525).

Even if we were to ignore this specific direction from the trier of fact, we would still conclude the error was harmless. Although Irizarry's testimony identifying Ashford as one of the robbers in the hallway was the only direct evidence that Ashford participated in the actual robbery, the rest of Irizarry's testimony was corroborated by his wife's testimony. His testimony as to the events of October 24, 1982, was contradicted by his preliminary hearing testimony on only minor points, such as who held the .38, and that there were four people instead of three. There was very extensive cross-examination with Irizarry concerning his other crimes and his drug use, so much so that the judge, the trier of fact, mistakenly referred to Irizarry as the defendant on occasion. (TR. 256, 275, 525). Finally, we find that the State's case was strong. The evidence was not circumstantial; it was direct eyewitness testimony of the victims who had known Ashford for a number of years. Accordingly, we find that if there was error, it was harmless beyond a reasonable doubt.

■ Next, we examine the significance of an admission that Irizarry knew of ongoing negotiations between his attorney and the State. First and foremost, this is not a situation where Irizarry testified to this version of the events on October 24, 1982, only after he was charged with the pending drug charges. His version in court was essentially the same version he told October 25, 1982, at the preliminary hearing, two years before he was arrested on the pending charges. Additionally, his testimony was corroborated by his wife's. Also, as discussed above, the State's case was strong. Accordingly, we find if there was any error committed by the trial court by limiting defense counsel's inquiry into Irizarry's knowledge of ongoing negotiations

between his attorney and the State on his pending charges, it was harmless beyond a reasonable doubt.

b.

■ Ashford's final issue in this petition concerns defense counsel's attempt to call the State's prosecuting attorney Mary Ellen Cagney to the stand in an attempt to impeach Irizarry's testimony as to why he failed to report the alleged offenses to the police:

Irizarry testified that he failed to report the offense to the police due to fear the report would prompt the offenders to return. However, when Irizarry was later asked whether he told Assistant State's Attorney Cagney that the reason he failed to call the police was that there were drugs in his apartment, he invoked the Fifth Amendment. The court would not allow petitioner to call Cagney as a witness to impeach Irizarry on a material fact, a fact supporting petitioner's theory of defense.

(Pet.Memo in Support at 5).

The trial court refused defense counsel's attempt to place Cagney on the stand because the court found that it was unnecessary because of the extensive cross-examination regarding the issue of why Irizarry did not immediately call the police. The Illinois Court of Appeals agreed and noted that under Illinois law a trial court has wide discretion in determining whether a defendant may call the prosecuting attorney as a witness, citing *People v. Gendron*, 41 Ill.2d 351, 355, 243 N.E.2d 208, 213, (1968), *cert. denied*, 396 U.S. 889, 90 S.Ct. 179, 24 L.Ed.2d 164 (1969). The Illinois Appellate Court then held that the trial court did not abuse its discretion when it denied defense counsel's request.

In support of this argument, Ashford cites *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).[4]

---

**4.** The Supreme Court has recently identified *Chambers* as a Compulsory Process Clause case along with *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Taylor v. Illinois*, 42 Crim.L.Rep. (BNA) 3042, 3043–44 n. 9 (U.S. Jan. 25, 1988). In *Taylor*, the Supreme

Court held that the Compulsory Process Clause is not violated by the exclusion of a criminal defense witness' testimony as a sanction for violation of a discovery rule when the explanation for the failure to comply reveals that the failure was both willful and motivated by a

In *Chambers*, the Court invalidated a state's hearsay rule on the ground that it abridged the defendant's right to "present witnesses in his own defense." *Id.* at 302, 93 S.Ct. at 1049. Chambers was tried for a murder to which another person repeatedly had confessed in the presence of acquaintances. The State's hearsay rule, *coupled* with a "voucher" rule that did not allow the defendant to cross-examine the confessed murdered directly, prevented Chambers from introducing testimony concerning these confessions, which were critical to his defense. The Supreme Court reversed the judgment of conviction, holding that when a state rule of evidence conflicts with the right to present witnesses, the rule may "not be applied mechanistically to defeat the ends of justice," but must meet the fundamental standards of due process. *Id.* In the Court's view, the State in *Chambers* did not demonstrate that the hearsay testimony in that case, which bore "assurances of trustworthiness" including corroboration by other evidence, would be unreliable, and thus the defendant should have been able to introduce the exculpatory testimony. *Id.*

In addressing this issue, the Seventh Circuit has adopted the following analysis:

The right of a defendant to present relevant and competent evidence is not absolute and may "bow to accommodate other legitimate interests in the criminal trial process" ... although the competing state interests must be substantial to overcome the claims of the defendant. Our task is thus to evaluate the exculpa-

tory significance of the proffered evidence ... and then to balance it against the competing state interest in the procedural rules that prevented the defendant from presenting this evidence at his trial.[5]

*United States ex rel. Enoch v. Hartigan,* 768 F.2d 161, 163 (7th Cir.1985) (citing *McMorris v. Israel,* 643 F.2d 458, 461 (7th Cir.1981), *cert. denied,* 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684, (1982)) *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986). In this case, Ashford sets forth the proffered evidence as this statement made by counsel at trial:

It is my belief that she [Cagney] would testify that the victim told her he was, in fact, a drug dealer. And, secondly, that the reason he did not call the police was because they—there were drugs in the apartment, and he didn't want the police there.

(TR. 452).[6] However, unlike *Enoch,* 768 F.2d 161, here the record reflects a dispute whether Ms. Cagney would indeed testify to the statements made in the proffer. In response to defense counsel's offer of proof, Ms. Cagney made her own offer of proof:

MS. CAGNEY: Judge, first of all by way of offer of proof, if counsel expected—if counsel expects that is what I am going to say on the stand, I can tell him right now it is not. Those were not the words of the victim to me.

(TR. 453).[7] Thus, if the defense counsel's version of the proffer should have been

---

desire to obtain a tactical advantage. *Taylor,* 42 Crim.L.Rep. at 3046.

**5.** In *Taylor v. Illinois,* 42 Crim.L.Rep. 3042 (U.S. Jan. 25, 1988), the Court's most recent case in this area, the Supreme Court did not identify the standard governing this constitutional inquiry. The dissent, however, citing the majority opinion in *Rock v. Arkansas,* — U.S. ——, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987), sets forth a very similar standard to the Seventh Circuit:

restrictions on the right to present criminal defense evidence can be constitutional only if they " 'accommodate other legitimate interests in the criminal trial process' " and are not "arbitrary or disproportionate to the purpose they are designed to serve."

*Taylor,* 42 Crim.L.Rep. 3042, 3048 (U.S. Jan. 25, 1988) (Brennan, J., dissenting).

**6.** We note that Ashford does not in this petition argue that the State allowed false testimony to stand uncorrected and does not base his claim on such an argument. Rather, it seems clear that what Ashford really complains of is his inability to call Cagney to have her testify to questions to which Irizarry invoked the Fifth Amendment.

**7.** This competing offer of proof which came toward the end of trial was not the only colloquy on the subject. During the cross-examination of Irizarry, defense counsel suggested in a side bar that the State was withholding information:

MR. PTACEK: Judge, I ask the State to answer the question whether or not he is a drug dealer and whether or not he has admitted

admitted, we would need to conduct an evidentiary hearing to determine whether the proffered evidence is as defense counsel stated or as State's Attorney Cagney stated. Before ordering a hearing on this issue, we will assume the correctness of the defense counsel's proffer and determine whether its failure to be admitted raises to the level of a constitutional violation, and if so, whether the error was harmless.

Ashford's only purpose in eliciting this testimony is to impeach Irizarry on the issue of why Irizarry did not call the police on his own to report the crime.

> This evidence that Irizarry failed to call the police because he feared the police would find drugs in the apartment was important in the defense attempt to *discredit* the witness on a material fact.

> *  *  *  *  *  *

> This ruling which prevented the defense from attempting to *impeach* the witness on a crucial matter also requires that this Court order relief.

(Pet.Memo in Support at 16–17) (emphasis added). To determine if there is a constitutional violation, we need to balance state's interest in not having the only prosecuting attorney testify with the exculpatory significance of the excluded testimony. In this case, however, the proffered evidence is not exculpatory on its face. It tends to cast doubt upon Irizarry's testimony but not necessarily as to points that incriminate Ashford. The fact that Irizarry may have been lying about his reasons for not calling the police does not necessarily mean that the robbery did not occur. It merely impeaches his testimony. In *Chambers*, 410 U.S. 284, 93 S.Ct. 1038, the facts were much more compelling. In addition to the state court's ruling that prevented Chambers from presenting his three witnesses who would testify that another witness had admitted to the murder, the State Court denied Chambers the right to examine the alleged confessor as a hostile witness. *Id.* at 295, 93 S.Ct. at 1046. This combination led the Court to find a due process violation. We do not think that the alleged error in this case was an error of constitutional magnitude. Additionally, based on the trial court's statement that even if it were proved that Irizarry was a drug dealer and that he had drugs in his apartment, she would still have found the defendants guilty, and based on our discussion of harmless error above, we find that any alleged error would be harmless beyond a reasonable doubt.

———

In conclusion, we find that Ashford's Sixth Amendment right of confrontation

that to them. Under *Brady* [*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ], we are entitled to that information.
If they have a witness who told them he is a drug dealer I think that evidence is favorable to the defense.
*  *  *  *  *  *
MS. CAGNEY: I don't understand. Am I now a witness? If that is so he should have said something like this to me. Are they going to call me as a witness? How is this evidence? I have conveyed to them what I know of the case. I have answered discovery. They are aware of everything that I am aware of. There are no secrets in this case.
*  *  *  *  *  *
MS. CAGNEY: They have all of the information that I have.
MR. PTACEK: Is the State then saying to this Court that he never made that statement to her?
THE COURT: This is what it sounds like to me?
MS. CAGNEY: Your Honor, what I am saying is they know everything that I know. I have had conversations with Mr. Paese and Mr. Ptacek.
MR. PTACEK: There was a statement made to me by Ms. Cagney that Juan would make certain admissions and I quote, "That he is a drug dealer."
MS. CAGNEY: I can say what I said.
THE COURT: What did you say?
MS. CAGNEY: I said he may make admissions that he was selling drugs at the time of the crime. That is different than saying he is a drug dealer. We are talking about October, 1982. The man never said to me I am a drug dealer. I will say that on the record.
THE COURT: Now you have the answer to your question.
MR. PAESE: If I might further, Ms. Cagney indicated that Juan said he didn't call the police because he was afraid of the police finding drugs in his house.
MS. CAGNEY: I am not a witness, first of all. Ask him. He didn't make that statement to me.
(TR. 228–231).

was not violated by either Irizarry's invocation of his Fifth Amendment nor the trial court's improper limitation on the defense counsel's inquiry into Irizarry's knowledge of ongoing negotiations between Irizarry's counsel and the State's Attorney on the pending charges against Irizarry. We also find that Ashford was not denied the right to a fair trial by the State Court's refusal to allow the State's prosecuting attorney to testify for the defense. Finally, we conclude that if there were errors, the errors were harmless beyond a reasonable doubt. Accordingly, petitioner Ashford's writ of habeas corpus is denied. It is so ordered.